J-S36045-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF: A.R.D. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.C., MOTHER | No. 362 WDA 2015 |

Appeal from the Order Entered January 30, 2015,
in the Court of Common Pleas of Westmoreland County,
Orphans' Court, at No.: 92 of 2014

BEFORE:  PANELLA, JENKINS, and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.:　　　　　**FILED JULY 09, 2015**

J.C. (Mother) appeals from the order entered January 30, 2015, in the Court of Common Pleas of Westmoreland County, which terminated involuntarily her parental rights to her minor daughter, A.R.D. (Child), born in December of 2009.[1]  We affirm.

Child was removed from Mother's care on December 14, 2012, after Westmoreland County Children's Bureau (WCCB) received an emergency referral indicating that Mother was engaging in prostitution and illegal drug use.  In addition, it was reported that Mother was storing prescription bottles full of "clean" urine in her home, in order to avoid positive drug screens. Child was adjudicated dependent by order dated February 19, 2013.

---

* Retired Senior Judge assigned to the Superior Court.

[1] At the time of Child's birth, Mother was married to R.C., Jr.  However, a paternity test revealed that R.C., Jr. is not the father of Child.  R.C., Jr. executed a consent to adoption, which was confirmed by order of court on December 12, 2014.  The identity of Child's father remains unknown.  The orphans' court entered an order terminating the parental rights of Child's unknown father on January 30, 2015.

On September 20, 2014, WCCB filed a petition to terminate Mother's parental rights to Child involuntarily. A termination hearing was held on January 26, 2015. On January 30, 2015, the orphans' court entered its order terminating Mother's rights. Mother timely filed a notice of appeal, along with a concise statement of errors complained of on appeal.

Mother now raises the following issue for our review:

> Whether the [orphans'] court erred in finding by clear and convincing evidence that [WCCB] met its burden under 23 Pa.C.S. §[]2511(b) that the best interest of the child was met by terminating [M]other's parental rights when the [orphans'] court did not have an adequate record to make this determination because the bond between [M]other and [C]hild was not examined?

Mother's brief at 4.

We consider Mother's claim mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Mother's parental rights pursuant to Sections 2511(a)(2), (5), (8), and (b), which provide as follows.

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> ***

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

> ***

> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement

- 3 -

with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\*\*\*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\*\*\*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).

On appeal, Mother presents no argument with respect to Section 2511(a). Thus, any challenge to Section 2511(a) is waived, and we need only consider whether the court abused its discretion by terminating

Mother's parental rights pursuant to Section 2511(b). *See In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) (quoting *In re A.C.*, 991 A.2d 884, 897 (Pa. Super. 2010)) ("'[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.'"). We have discussed our analysis under Section 2511(b) as follows.

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

- 5 -

Here, Mother argues that there is no evidence of record with respect to the bond between Mother and Child. Mother's brief at 10. Mother contends that the order terminating her parental rights should be reversed and that the case should be remanded so that additional evidence can be provided concerning the effect that terminating Mother's parental rights would have on Child. *Id.*

The orphans' court found that Mother failed to appear for a bonding evaluation with Child, but that there was still sufficient evidence from which to conclude that termination of Mother's parental rights would serve Child's needs and welfare. Orphans' Court Opinion, 3/19/2015, at 13. The court emphasized that Child has bonded with her current foster parents and that maintaining whatever bond exists between Mother and Child will cause instability and inconsistency in Child's life. *Id.* at 15.

After a thorough review of the record in this matter, we conclude that the orphans' court did not abuse its discretion by terminating Mother's parental rights to Child involuntarily. Ms. Kathy Menzler testified that she supervised visits between Mother and Child, and that she provided Mother with "hands-on parenting" instruction, *inter alia*. N.T., 1/26/2015, at 36-37. Ms. Menzler stated that Mother's supervised visits began in late December of 2012. *Id.* By June of 2013, it was anticipated that Child would be reunified with Mother prior to the next permanency review hearing in December of 2013. *Id.* at 39-40. However, Mother began to attend her visits with Child

inconsistently. *Id.* at 41. Mother missed several visits in August of 2013, and her visits were suspended through September of 2013. *Id.* at 41-42. In October of 2013, Mother's visits with Child were reinstated, and Mother was attending visitation consistently. *Id.* at 43. By November of 2013, Mother and Child were having "great visits," and Mother's parenting skills were "markedly better." *Id.* at 46. By December of 2013, it appeared that reunification was a "real possibility" and could be achieved by June of 2014. *Id.* at 46-47. In January of 2014, Child began spending weekends in Mother's care. *Id.* at 48.

However, on February 7, 2014, Mother tested positive for cocaine. *Id.* at 48-49. Ms. Menzler explained that Mother then was offered only supervised visits with Child and that Mother again began to attend visits inconsistently. *Id.* at 49-50. Specifically, Mother missed numerous visits in February and March of 2014, and Mother's visits were suspended through April of 2014. *Id.* at 49-51. Mother did not visit with Child again until May 22, 2014. *Id.* at 51. Following this visit, Mother failed to attend several visits in late May and June of 2014. *Id.* at 52-53. On June 18, 2014, Mother failed to attend a scheduled visit and sent Ms. Menzler a text message stating that "she would not be coming to any more visits with [Child;] she said she lost two children already and couldn't see [Child]."[2]

---

[2] Mother later testified that she "signed over" custody of her other children. N.T., 1/26/2015, at 115.

*Id.* at 53. Mother last saw Child for about 10 or 15 minutes prior to a permanency review hearing in June of 2014. *Id.* at 55.

With respect to the relationship between Mother and Child, Ms. Menzler testified that Child initially would become distraught and cry when Mother failed to attend visits, and that Child would ask why Mother was not coming and state, "[M]y mommy doesn't love me." *Id.* at 44, 49. Ms. Menzler noted that Child was excited to see Mother during the visit on May 22, 2014. *Id.* at 51. However, by June of 2014, Child no longer would become upset when Mother did not attend visits. *Id.* at 55. On July 7, 2014, Child told Ms. Menzler that she wanted to be adopted. *Id.* at 56.

Ms. Dawn Traill testified that she has been Child's WCCB caseworker since June 26, 2014. *Id.* at 63, 88. Ms. Traill stated that Child is "doing wonderful" in her current pre-adoptive foster home. *Id.* at 89. Ms. Trail noted that Child does not talk about Mother. *Id.* When Ms. Traill brings up the subject of Mother, Child "doesn't say anything. She moves on in the conversation." *Id.* In addition, Child has indicated that she wants to be adopted by her current foster family. *Id.* at 90. Ms. Traill opined that Child would not be harmed if Mother's parental rights were terminated. *Id.* at 90, 95.

Psychologist Carol Patterson testified as an expert in the field of bonding and attachment. *Id.* at 7. Ms. Patterson testified that she performed a bonding and attachment evaluation with respect to Child and

her former foster mother on October 8, 2014, and that she performed a bonding and attachment evaluation with respect to Child and her current foster parents on October 15, 2014.[3] *Id.* at 7-8. Ms. Patterson explained that Child demonstrated a "very strong bond" with her former foster mother. *Id.* at 8. Ms. Patterson noted that Child appears to view her former foster mother as her grandmother and calls her "grandma." *Id.* Ms. Patterson stated that Child demonstrated "even a stronger bond" with her current foster parents, that she appears to view them as primary parental figures, and that she calls them "mommy and daddy." *Id.* at 9.

Ms. Patterson further testified that an evaluation with respect to Child and Mother had been scheduled for September 30, 2014, but that Mother failed to attend. *Id.* at 10. The evaluation subsequently was rescheduled for October 7, 2014, but Ms. Patterson received a call from WCCB indicating that Mother could not attend due to a court hearing. *Id.* Mother called on January 19, 2015, to reschedule the evaluation again. *Id.* Ms. Patterson

---

[3] At the time Ms. Patterson conducted her bonding evaluations, Child was living with her former foster parents and visiting with her current foster parents on the weekends. N.T., 1/26/2015, at 9. At the time of the termination hearing, Ms. Patterson was not aware that Child now was living full-time with her current foster parents as of December 8, 2014. *Id.* at 9-10, 19-20. As a result, Ms. Patterson described Child's former foster parents as her "current foster parents" and described her current foster parents as her "secondary foster parents." *Id.* at 8.

stated that the evaluation now was scheduled for March 3, 2015.[4] *Id.* at 10-11.

Ms. Sacha Martin testified that she is a licensed marriage and family therapist, and that she has provided mental health counseling to Child since December 12, 2013. *Id.* at 22-23. Ms. Martin explained that she has been endeavoring to address Child's behavioral issues, including "verbal aggressions, non-compliance with adults," and "inability to express her anger in appropriate ways." *Id.* at 23. According to Ms. Martin, Child's behavioral issues resulted from her lack of "a secure attachment" and "a place to call home." *Id.* Ms. Martin noted that Child experienced behavioral issues after being placed with her current foster parents, but that those behaviors have decreased "in the past few weeks." *Id.* at 23-24.

_____

[4] Ms. Patterson produced a report explaining her findings, which was entered into evidence as WCCB Exhibit 1. In her report, Ms. Patterson stated that she was unable to determine the nature of the bond between Mother and Child, as Mother failed to appear at her bonding evaluation. WCCB Exhibit 1 at 15. However, Ms. Patterson opined that, given Mother's lack of contact with Child, *inter alia*, "[Child] has been able to transfer any existing bond or attachment that she may have had with her mother" to her former foster parents, and that Child has "developed a strong bond and beginning attachment" with her current foster parents. *Id.* Ms. Patterson attempted to testify to this conclusion during the termination hearing, but Mother's counsel objected. N.T., 1/26/2015, at 12-18. The orphans' court sustained the objection, concluding that Ms. Patterson's opinion as to what sort of bond Child may have with Mother only was addressed at the end of her report, and that this opinion was contradicted by Ms. Patterson's statement that she could not assess the bond between Mother and Child because Mother failed to appear at her bonding evaluation. *Id.* at 16-19.

Ms. Martin further testified that Child is "functioning pretty well" and doing "very well" in the foster home. *Id.* at 23-24. She also stated that Child has been "adjusting well" and is "very happy." *Id.* at 25. Ms. Martin observed that Mother's lack of contact with Child has made Child "very sad." *Id.* at 25. However, Ms. Martin explained that she recommended in early December of 2014 that Child no longer have visits with Mother, as Child was adjusting to her new foster home and needed stability, and because "to introduce an inconsistent factor at that point I don't think would have been beneficial for [Child]." *Id.* at 25-26. Specifically, Ms. Martin drafted a letter, dated December 30, 2014, in which she indicated that visitation between Child and Mother would impact Child's "mental health stability in a negative way" and limit her ability to bond with her current foster parents. *Id.* at 33-34. Ms. Martin opined that Child would not suffer any harm if Mother's parental rights were terminated. *Id.* at 26.

Mother testified that she is 33 years old and that she has suffered from substance abuse issues since she was 17 years old. *Id.* at 103. Mother explained that her failure to visit with Child resulted from drug use and the fact that she was "not in the right state of mind." *Id.* at 104, 112. However, Mother stated that she attended drug abuse treatment from November 24, 2014, until December 19, 2014, and that she was discharged successfully from that program. *Id.* Mother claimed that she no longer is using drugs or alcohol, that she now is attending "12 step meetings" and

being prescribed Suboxone, and that she soon will be engaging in additional dual diagnosis treatment. *Id.* at 103, 106, 108-09, 119. Mother indicated that she contacted WCCB to request visitation shortly after leaving her most recent rehabilitation program. *Id.* at 112. Mother denied that she ever made statements suggesting that she would give up her rights to Child voluntarily. *Id.* at 111. Mother indicated that she loves Child and that Child loves her and is happy to spend time with her. *Id.* at 113.

The record supports the orphans' court's conclusion that it would serve Child's needs and welfare to terminate Mother's parental rights. As observed by the orphans' court, a formal bonding evaluation is not necessary in order to support a termination order. *See In re K.H.B.*, 107 A.3d 175, 180 (Pa. Super. 2014) (citing *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010)) ("[I]n conducting a bonding analysis, the court is not required to use expert testimony, but may rely on the testimony of social workers and caseworkers."). In addition, it appears that whatever bond existed between Mother and Child has weakened significantly as a result of Child's lengthy stay in foster care and Mother's failure or refusal to visit with Child. Child is doing well in foster care and has stated that she wants to be adopted. It is clear that any remaining bond that Mother and Child still may have is outweighed by Mother's history of neglect and drug relapse, and by Child's need for permanence and stability. *See C.D.R.*, 111 A.3d at 1220 (concluding that the appellant mother's bond with C.D.R. was outweighed by

the mother's "repeated failure to remedy her parental incapacity," and by C.D.R.'s need for permanence and stability). No relief is due.

Accordingly, because we conclude that the orphans' court did not abuse its discretion by involuntarily terminating Mother's parental rights to Child, we affirm the order of the orphans' court.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/9/2015