J-A10043-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: D.P., | : | IN THE SUPERIOR COURT OF |
| MINOR CHILD | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.P., BIRTH FATHER | : | No. 1615 WDA 2015 |

Appeal from the Order September 18, 2015
In the Court of Common Pleas of Washington County
Orphans' Court at No(s): 63-OC-2015-0176

BEFORE:  GANTMAN, P.J., BENDER, P.J.E., and PANELLA, J.

MEMORANDUM BY GANTMAN, P.J.:                **FILED JUNE 24, 2016**

Appellant, D.P. ("Father"), appeals from the order entered in the Washington County Court of Common Pleas, which granted the petition of the Washington County Children & Youth Services Agency ("CYS") for involuntary termination of Father's parental rights to his minor child, D.P. ("Child").[1]  We agree with the court's decision on the involuntary termination of Father's parental rights under Section 2511(a)(1); but we vacate the termination order and remand for reconsideration under Section 2511(b) and for further proceedings, if necessary.

In its opinions, the trial court fully and correctly set forth the relevant facts and procedural history of this case.  Therefore, we just briefly summarize them here.  In September 2012, CYS received a report that

_____

[1] M.H. ("Mother") also appeals from the order which granted involuntary termination of her parental rights to Child; her appeal is docketed at No. 1650 WDA 2015.

Mother left Child (born in 2010) unattended in a car while she shopped for groceries, and that Child was unsecured in the vehicle. The report also stated Mother had urinated on the floor of the grocery store. CYS conducted a home visit and subsequently filed a dependency petition on the bases that Mother and Father were abusing prescription drugs, Mother was suffering from mental illness, and Child and the home were dirty. The court adjudicated Child dependent on September 14, 2012, and ordered services for both parents. CYS placed Child with his paternal aunt and uncle. At a permanency review hearing on November 16, 2012, the parties stipulated to a finding of continuing dependency. Prior to the hearing, Father underwent a drug and alcohol evaluation which returned a diagnosis of opiate dependence. The parties again stipulated to a finding of continuing dependency at the next permanency review hearing on February 15, 2013. By this hearing, both parents had been compliant with treatment recommendations, were participating in services, and were completing their parenting education programs. At another permanency review hearing on March 15, 2013, the parties again stipulated to a finding of continuing dependency. By this time, Father's medical providers reported Father had a positive prognosis for recovery.

On August 26, 2013, the court held another permanency review hearing at which time the court found that Child remained dependent but permitted Child to return to Father's home. Father lived with his mother

("Paternal Grandmother") at that time. The court ordered supervised visits for Mother. The court specifically ordered Father to have no contact with Mother while Child was in his care. At a permanency review hearing on November 12, 2013, the parties stipulated to a finding of continuing dependency; Child remained in Father's care. On March 3, 2014, CYS requested termination of court supervision because Child was safe and doing well in Father's care, and the court granted CYS' request.

Three months later, CYS became involved with Child's family again after receiving allegations Father was abusing narcotics. On June 16, 2014, both parents were arrested in West Virginia for intoxication in a moving vehicle with Child present. Mother and Father were convicted of crimes relating to child endangerment and subsequently incarcerated. CYS placed Child in the care of Paternal Grandmother. CYS filed a dependency petition on June 18, 2014, and the court adjudicated Child dependent on July 1, 2014. The court ordered Child to remain with Paternal Grandmother and ordered services for both parents.

At permanency review hearings on September 29, 2014 and December 29, 2014, a juvenile hearing officer found no compliance with the permanency plan and no progress towards alleviating the circumstances which necessitated Child's placement, based on parents' inability to undergo services while incarcerated out of state. On January 11, 2015, Father was released from incarceration; Mother remained incarcerated. The court did

not allow Father to resume living with Paternal Grandmother following his release from incarceration. At a permanency review hearing on March 23, 2015, the juvenile hearing officer determined Mother was noncompliant and made no progress due to her continued incarceration but found Father had made substantial progress by completing a drug and alcohol evaluation, participating in drug and alcohol treatment, participating in parenting education classes, and testing negative for drugs. The hearing officer granted Mother supervised visits in jail and Father liberal supervised visits in Paternal Grandmother's home.

On February 11, 2015, CYS filed a petition for involuntary termination of Mother's and Father's parental rights to Child. The court held a termination hearing on May 27, 2015. On September 18, 2015, the court granted CYS' petition. Father timely filed a notice of appeal on October 13, 2015, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).

Father raises two issues for our review:

> DID THE TRIAL COURT ERR IN TERMINATING FATHER'S PARENTAL RIGHTS WHERE THE AGENCY FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT FATHER EVIDENCED A SETTLED PURPOSE OF RELINQUISHING PARENTAL CLAIMS TO CHILD AND FAILED TO PROVE THAT FATHER REFUSED OR FAILED TO PERFORM PARENTAL DUTIES?
>
> DID THE TRIAL COURT COMMIT REVERSIBLE ERROR IN FAILING TO CONDUCT AN APPROPRIATE ANALYSIS AS REQUIRED BY 23 PA.C.S.A. § 2511(B) WHERE THE COURT HELD THAT ALTHOUGH THERE WAS A BOND BETWEEN

FATHER AND [CHILD], THERE WOULD BE NO DETRIMENTAL EFFECT OF SEVERING THE BOND BECAUSE PATERNAL GRANDMOTHER WOULD BE WILLING TO CONTINUE TO ALLOW CONTACT BETWEEN FATHER AND THE MINOR CHILD?

(Father's Brief at 8).

The standard and scope of review applicable in termination of parental rights cases are as follows:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that it would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.
>
> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.
>
> The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. We may uphold a termination decision if any proper basis exists for the result reached. If the trial court's findings are supported by competent evidence, we must affirm the court's decision, even though the record could support an opposite result.

*In re Adoption of K.J.*, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal*

*denied*, 597 Pa. 718, 951 A.2d 1165 (2008) (internal citations omitted).

For purposes of disposition, we combine Father's issues. Father argues he did not abandon Child. Father asserts he loves Child, and Child loves him. Father maintains he contacted Child at least weekly during his incarceration and sent letters to Child via Paternal Grandmother. Father emphasizes that he visited Child the same day he was released from incarceration and has seen Child almost every day since then. Father insists no evidence supports the court's conclusion that Father demonstrated a settled purpose to relinquish his parental rights to Child.

Father concedes he was incarcerated for five of the six months preceding CYS' filing the termination petition at issue, but he contends he made consistent efforts during that timeframe to maintain a place of importance in Child's life. Father avers he would have provided financial support for Child while he was incarcerated if he had the means to do so. Father highlights Paternal Grandmother's testimony, which the court found credible, that Father visits with Child five to seven days a week since his release from incarceration, does activities with Child, bathes Child and gets Child ready for bed, and waits for Child to fall asleep before Father leaves so not to upset Child. Father submits Paternal Grandmother's testimony makes clear Father performs parental duties for Child. Father also contends the court should not have considered Child's initial placement with CYS in 2012 when discussing the length of this case, because the court closed that case

in 2014. Father emphasizes that termination of his parental rights does not advance Child's need for permanency under the unique facts of this case because Father would reside in Paternal Grandmother's home if he regained custody of Child, so Child would continue to live in the same home he lives in now. Father proclaims he has made substantial progress towards alleviating the circumstances which necessitated Child's placement, and the court's termination of his parental rights under Section 2511(a)(1) was improper.

With respect to Section 2511(b), Father argues CYS presented no testimony on the effect that severance of Father and Child's strong bond would have on Child. Father highlights testimony from Paternal Grandmother and Mr. Poland (the Try-Again Homes caseworker) concerning Father's love for Child, Child's excitement to tell others about his time with Father, and the bond between them. Father insists the court's reliance on Paternal Grandmother's testimony that she will permit ongoing contact between Father and Child upon termination was an unsound basis for deciding that termination of Father's parental rights will not harm Child irreparably. Father suggests the purpose of termination is to sever any rights, legal duties, or legal bond between the parent and child, so the court cannot assume the parent-child bond will survive termination when making its decision. Father contends the court should not have considered Paternal Grandmother's "promise" to permit continued contact between Father and

Child because Paternal Grandmother is not bound by that "promise" and if she reneges on it, the court's termination analysis will be frustrated. In such a scenario, Father complains he would lack any legal ground to petition the court for a remedy.[2] Father concludes the court's termination decision under Section 2511(a)(1) and (b) was erroneous, and this Court must reverse. We agree with some of Father's contentions.

The court granted CYS' petition for involuntary termination of Father's parental rights on the following grounds:[3]

**§ 2511. Grounds for involuntary termination**

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\* \* \*

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors

---

[2] At the conclusion of the termination hearing, the court asked the parties to submit post-hearing briefs regarding whether the court could consider Paternal Grandmother's intent to permit continuing contact between parents and Child in making its termination determination. Father complied with the court's directive.

[3] CYS sought involuntary termination of Father's parental rights under Section 2511(a)(1), (a)(2), (a)(5), and (b).

such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. §§ 2511(a)(1); (b). "Satisfaction of any one subsection of Section 2511(a), along with consideration of Section 2511(b), is sufficient for involuntary termination of parental rights." *In re K.Z.S.*, 946 A.2d 753, 758 (Pa.Super. 2008).

A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child **or** fails to perform parental duties for at least the six months prior to the filing of the termination petition. *In re C.S.*, 761 A.2d 1197 (Pa.Super. 2000) (*en banc*). "Although it is the six months immediately preceding the filing of the petition that is most critical to the analysis, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision." *In re B.,N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005). The court must examine the individual circumstances of each case to determine if the evidence, in light of the totality of the circumstances, warrants termination. *Id.*

"Under [S]ection 2511, the trial court must engage in a bifurcated process." *In re I.J.*, 972 A.2d 5, 10 (Pa.Super. 2009).

The initial focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies at least one of the nine statutory grounds delineated in section 2511(a). If the trial court determines that the parent's conduct warrants termination under section 2511(a), then it must engage in an analysis of the best interests of the child…under section 2511(b), taking into primary consideration the developmental, physical, and emotional needs of the child.

\* \* \*

[A] best interest of the child analysis under [section] 2511(b) requires consideration of intangibles such as love, comfort, security, and stability. To this end, this Court has indicated that the trial court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond. Moreover, in performing a "best interests" analysis[, t]he court should also consider the importance of continuity of relationships to the child, because severing close parental ties is usually extremely painful. The court must consider whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. Most importantly, adequate consideration must be given to the needs and welfare of the child.

*Id.* at 10-12 (internal citations and quotation marks omitted).

Section 2511 outlines certain irreducible minimum requirements of care that parents must provide for their children and a parent who cannot or will not meet the requirements may properly be considered unfit and have his parental rights terminated. *In re B.L.L.*, 787 A.2d 1007 (Pa.Super. 2001).

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love,

- 10 -

protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his…ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship.

*In re B.,N.M., supra* at 855 (internal citations omitted). Accordingly, "a parent's basic constitutional right to the custody and rearing of his…child is converted, upon the failure to fulfill his…parental duties, to the child's right to have proper parenting and fulfillment of his…potential in a permanent, healthy, safe environment." *Id.* at 856.

With respect to an incarcerated parent, this Court has stated:

[I]ncarceration alone does not provide sufficient grounds for the termination of parental rights. Likewise, a parent's incarceration does not preclude termination of parental rights if the incarcerated parent fails to utilize given resources and [fails] to take affirmative steps to support a parent-child relationship. As such, a parent's

- 11 -

responsibilities are not tolled during incarceration. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In re Adoption of K.J., supra* at 1133 (internal citations and quotation marks omitted). Further, "[t]he cause of incarceration may be particularly relevant to the Section 2511(a) analysis, where imprisonment arises as a direct result of the parent's actions which were part of the original reasons for the removal of the child." *In re Z.P.*, 994 A.2d 1108, 1120 (Pa.Super. 2010) (internal quotation marks omitted).

With respect to Section 2511(b), "When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *Id.* at 1121 (internal citations omitted). "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S., supra* at 762-63. "While a parent's emotional bond with his…child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." *In re N.A.M.*, 33 A.3d 95, 104 (Pa.Super. 2011). "The mere existence of an emotional bond does not preclude the termination

of parental rights." *Id.* Rather, the court "must examine the status of the bond to determine whether its termination would destroy an existing, necessary and beneficial relationship." *Id.* (internal citations and quotation marks omitted). "Above all else[,] adequate consideration must be given to the needs and welfare of the child. A parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights." *In re Z.P., supra* at 1121.

Further, "this Court has recognized a connection between the involuntary termination of parental rights and the Adoption and Safe Families Act ("ASFA")…" *In re R.M.G.*, 997 A.2d 339, 349 (Pa.Super. 2010), *appeal denied*, 608 Pa. 648, 12 A.3d 372 (2010). The stated policy of the ASFA is:

> [T]o remove children from foster placement limbo where they know neither a committed parent nor can [they] look toward some semblance of a normal family life that is legally and emotionally equivalent to a natural family…. States such as Pennsylvania, which participate in the program, are required to return the child to its home following foster placement, but failing to accomplish this due to the failure of the parent to benefit by such reasonable efforts, to move toward termination of parental rights and placement of the child through adoption. Foster home drift, one of the major failures of the child welfare system, was addressed by the federal government by a commitment to permanency planning, and mandated by the law of Pennsylvania in its participation in the Adoption and Safe Families Act of 1997. Succinctly, this means that when a child is placed in foster care, after reasonable efforts have been made to reestablish the biological relationship, the needs and welfare of the child

- 13 -

require CYS and foster care institutions to work toward termination of parental rights, placing the child with adoptive parents. **It is contemplated this process realistically should be completed within 18 months.**

Essentially, this legislation shifted away from an inappropriate focus on protecting the rights of parents to the priority of the safety, permanency and well-being of the child. While this 18-month time frame may in some circumstances seem short, it is based on the policy that a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*Id.* (internal citations and quotation marks omitted) (emphasis in original).

Section 2731 *et seq.* of the Adoption Act governs voluntary agreements for continuing contact and provides, in pertinent part, as follows:

**§ 2731. Purpose of subchapter**

The purpose of this subchapter is to provide an option for adoptive parents and birth relatives to enter into a voluntary agreement for ongoing communication or contact that:

(1) is in the best interest of the child;

(2) recognizes the parties' interests and desires for ongoing communication or contact;

(3) is appropriate given the role of the parties in the child's life; and

(4) is subject to approval by the courts.

23 Pa.C.S.A. § 2731. A voluntary agreement for continuing contact "shall be filed with the court that finalizes the adoption of the child." 23 Pa.C.S.A. §

- 14 -

2735(a). The agreement shall not be legally enforceable unless approved by the court if certain statutory conditions are satisfied. ***See*** 23 Pa.C.S.A. § 2735(b), (c).

Importantly, "Open adoption is a purely voluntary arrangement requiring the consent of the adoptive parents in order to enter into an agreement with birth relatives for ongoing communication or contact that is in the best interest of the child." ***In re Adoption of G.L.L.***, 124 A.3d 344, 348 (Pa.Super. 2015). ***See also In re K.H.B.***, 107 A.3d 175 (Pa.Super. 2014) (explaining open adoption statute by its plain language makes agreement optional, and such agreement is not required by Section 2511). Consequently, the uncertainty of an open adoption is not appropriate or relevant in a termination analysis under Section 2511(b). ***In re Adoption of G.L.L., supra***. ***See also In re K.H.B., supra*** (holding trial court erred when it declined to grant petition for involuntary termination of parents' parental rights based on paternal aunt's unwillingness to enter into voluntary agreement for continuing contact; court improperly conflated analysis of termination of parental rights with adoption).

Instantly, the trial court explained its termination decision as follows:

> Agency Caseworker Tiffany Lindsay, Paternal Grandmother…, Try Again Homes Caseworker Bradley Poland, and Father testified at the termination hearing.
>
> Ms. Lindsay credibly testified that after both parents were incarcerated in West Virginia, their contact with [Child] was limited. … The parents "sporadically" called [Child] when they had "money on the books." According to Ms.

Lindsay, [Child] would get upset when talking with his father. Furthermore, from the time of their incarceration to the date of the hearing, neither Mother nor Father provided financial support for [Child].

Bradley Poland, a Try Again Homes caseworker, testified regarding the interaction of each parent with [Child]. Mr. Poland observed and supervised each parent with [Child]. … In contrast [to Mother], [Child] always mentioned his visits with his father and was excited to see his father. Father credibly testified that when he visits [Child] in the home of [Paternal Grandmother], he will wait until [Child] falls asleep to leave so as not to upset [Child] by his departure.

Ms. Lindsay stated that [Child] needs permanency and his interests are best served by termination and adoption by his paternal grandmother. Ms. Lindsay expressed sincere concern that if [Child] were returned to his parents he would encounter difficulties due to the unhealthy relationship Mother and Father have. …

In 2014, both Mother and Father [pled] guilty to charges relating to child endangerment in Marion County, West Virginia. At the time of the hearing, Father indicated he was participating in drug and alcohol counseling, a 12-step program, mental health treatment, and grief counseling concerning the loss of his daughter. He described long-term use of Oxycontin dating back to 1999. He admitted to abusing Xanax.

\* \* \*

At the time of the termination hearing, [Child] had been in and out of home placement for twenty-two (22) of the last thirty-two (32) months. Mother and Father were both incarcerated for over six months preceding the filing of the petition for termination. Father had been released from incarceration at the time of the hearing, but was still taking part in services necessary to remedy the conditions that led to placement. …

… When [Child] was returned to Father in 2014, the [c]ourt ordered Father to have no contact with Mother

while [Child] was in his custody. At the time of termination of court supervision in June 2014, Mother was still undergoing treatment for drug use. She has made no progress at alleviating the same circumstances since the second placement.

Similar conditions were the cause of placement in 2012. [Child] was returned to Father in 2014 after being in placement for eleven months. However, he was to be placed again ten months after return and [three] months after the termination of court supervision. The conditions that twice necessitated the placement of [Child] continue to exist, and no reliable or persuasive evidence was presented demonstrating that these conditions will be remedied by either parent within a reasonable period of time. …

\* \* \*

The credible testimony provided by [Ms.] Lindsay, [Paternal Grandmother] and Father indicated that a bond exists between [Child] and his Father that can be beneficial. However, Father has not maintained a safe and stable home, as evidenced by [Child's] necessary placement for twenty-two (22) of the last thirty-two (32) months, and his drug treatment is not complete. …

Ms. Lindsay testified that [Child] has a bond with both of his parents. Ms. Lindsay indicated that such bond will continue because [Paternal Grandmother] is committed to permitting contact between [Child] and his birth parents.

Ms. Lindsay testified that [Child] is doing well in the home of [Paternal Grandmother]. She testified that [Paternal Grandmother's] home is now "home" for [Child]. Furthermore, [Paternal Grandmother] is a pre-adoptive placement resource who is also willing to serve as a permanent legal custodian. [Ms.] Lindsay also indicated that [Paternal Grandmother] is willing to enter into a voluntary agreement for continuing contact with both parents pursuant to 23 Pa.C.S.A. § 2731 *et seq*.

\* \* \*

> **[Paternal Grandmother's] willingness to permit future contact was a factor the [c]ourt considered in determining if termination met the best interests of [Child]**. The effect of the severance of the parent-child bond will not be as severe because of Paternal Grandmother's credible assurance that she would permit contact between [Child] and his parents. The severance of the legal bond between parent and child does not inherently necessitate ending any relationship between parent and child. [Paternal Grandmother] credibly testified that she would enter into a post-adoption agreement. For these reasons, the [c]ourt found that severing the bond between [Child] and Father would not cause irreparable harm to [Child]. …

*    *    *

> As both parents have not alleviated the circumstances that twice necessitated placement, requiring this case to continue with the goal of reunification gives rise to the real possibility that [Child] may end up placed in kinship or foster care three times in as many years. The Agency met its burden by clear and convincing evidence, and the credible evidence indicated that it was in the best interests of [Child] to have the parent-child bond terminated. To deny the Agency's meritorious petition would be to unnecessarily delay permanency for [Child]. The [c]ourt appropriately terminated the rights of both parents. As such, this [c]ourt's order should be affirmed.

(Trial Court Opinion, filed November 23, 2015, at 14-20) (internal citations omitted) (emphasis added).

The record supports the court's termination decision under Section 2511(a)(1). Father's abuse of prescription drugs was a basis for Child's initial placement in 2012. Father began to make strides in his recovery, which permitted the court to return Child to Father's care in August 2013. Due to the unhealthy relationship between Mother and Father, the court

specifically ordered Father to have no contact with Mother while Child was in his care. Father complied with the court's directive and on March 3, 2014, the court granted CYS' petition to terminate court supervision because Child was safe and doing well in Father's care. Only three months later, however, CYS learned that Mother and Father had been arrested together in West Virginia for intoxication while in a moving vehicle with Child. Father subsequently pled guilty to charges related to child endangerment and was incarcerated until January 2015. Father's imprisonment arose as a direct result of the same actions (drug abuse) which necessitated Child's initial 2012 placement, which is particularly relevant to the Section 2511(a) analysis. ***See In re Z.P., supra***.

While incarcerated, Father called Child "sporadically" when he had "money on the books" and Child became upset when he spoke to Father. Father provided no financial support for Child from the time of his incarceration until the termination hearing. Although Father has made progress since his release from incarceration, the court recognized that at the time of the termination hearing Child had been in placement for twenty-two of the past thirty-two months and Child could no longer wait for Father to summon the ability to fulfill his parental responsibilities. ***See In re R.M.G., supra***. As well, the court was free to consider the entire history of the case when making its termination decision and was not bound to mechanically apply the six-month statutory provision under Section

2511(a)(1). **_See In re B.,N.M., supra_**. Thus, we see no reason to disrupt the court's termination decision under Section 2511(a)(1). **_See In re Adoption of K.J., supra_**.

Under Section 2511(b), the record makes clear the court considered when making its termination decision Paternal Grandmother's intent to permit ongoing contact between Father and Child pursuant to a voluntary agreement under Section 2731. The court noted a beneficial bond between Father and Child and decided that bond would not be severed upon termination of Father's parental rights, based on Paternal Grandmother's intent to permit ongoing contact. Even though the court found Paternal Grandmother's testimony credible, Paternal Grandmother is not bound by her "assurances" or "promises" at the termination hearing, as voluntary agreements to permit ongoing contact are optional and would not occur until after the court had already granted the petition for involuntary termination of Father's parental rights. **_See In re Adoption of G.L.L., supra_**; **_In re K.H.B., supra_**. Consequently, when analyzing the best interests of Child under Section 2511(b), the court should not have considered Paternal Grandmother's willingness to enter into a voluntary agreement under Section 2731. **_See id._** Accordingly, we agree with the court's decision under Section 2511(a)(1); but, we vacate the termination order and remand for reconsideration under Section 2511(b) and for further proceedings, if necessary. Upon remand, the court shall not consider Paternal

Grandmother's willingness to permit future contact between Father and Child as a factor in its decision.

Order vacated; case remanded with instructions. Jurisdiction is relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/24/2016

IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY, PENNSYLVANIA

ORPHAN'S COURT DIVISION

- - -

In re: Adoption of

D.P.,                                                     CP-63-OC-2015-0176
                                                          1615 WDA 2015
A minor child,                                            1650 WDA 2015
Appeals of D.P. and M.H., parents.

### Pa.R.A.P. 1925 Memorandum

The Court provides its opinion pursuant to Pa. R.A.P. 1925(A)(2)(ii).

Appellants D.P. ("Father") and M.H. ("Mother") challenge this Court's September

18, 2015 Order terminating their parental rights.

### Procedural History

### I.     First Placement

In September of 2012, the Washington County Children & Youth Services

Agency ("The Agency") received a report that Mother, M.H., left D.P., her minor

child, unattended in a car without license plates while she shopped for groceries,

that the child was unsecured in the vehicle, and that mother urinated on the floor of

the grocery store. Agency Caseworker Christal Reynolds filed a Dependency

Petition on September 11, 2012. In addition to this report, she indicated that she

had visited the home of the parents. As part of this home visit, Mother was unable

to change the child's diaper without assistance, she appeared unable to focus on tasks, and she refused a drug test. Father tested positive for benzodiazepines at the home visit, and later provided a prescription for such from recent dental work. Father, who did not have a valid driver's license, would not permit Mother to drive his car due to his concerns about her medication and drug usage.

Juvenile Hearing Office Jessica Roberts held a merit hearing on September 14, 2012. After hearing testimony from the parents, a paternal aunt, and the Agency Caseworker, she recommended that D.P. be found a dependent child under 42 Pa.C.S. § 6302(1), in that he was a child without parental care, custody, or control. She recommended this on the basis that both Mother and Father were abusing prescription drugs and/or narcotics, Mother was suffering from mental illness, and the home and D.P. appeared unclean. Furthermore, Ms. Reynolds testified at the hearing that M.H. had a "lengthy drug history including consumption of cocaine and opiates", a mental health diagnosis of bipolar disorder, and had a criminal history. The Honorable John F. DiSalle approved this recommendation.

Hearing Officer Roberts also found aggravating circumstances pursuant to 42 P.S. § 6302. On May 31, 2010, the Court involuntarily terminated M.H.'s parental rights to her child T.H. On that basis, Ms. Roberts recommended aggravated circumstances be found to exist, but she did not excuse the Agency

2

from making reasonable efforts to reunify the family. She ordered both parents to undergo drug and alcohol evaluations and to partake in a parenting education program. She also ordered Mother to continue with her mental health therapy. Finally, Ms. Roberts ordered D.P. placed with his paternal aunt and uncle, N · P. and R.P.

Ms. Roberts held the initial permanency review hearing on November 16, 2012. All parties attended. At that time, the parties stipulated to a finding of continuing dependency. Paternal Aunt N · P. testified that she believed both Mother and Father to be under the influence during their periods of supervised visitation. She also testified that she witnessed them argue with each other during visitation. Prior to the hearing, Father underwent a drug and alcohol evaluation, which returned a diagnosis of opiate dependence. Ms. Roberts reported he was taking Suboxone and Subutex, a treatment for opiate withdrawal, and pursuing therapy. Mother also completed her evaluations and received a diagnosis of bipolar I disorder and opiate dependence. She was also prescribed Suboxone and Subutex, as well as Lamictal, a drug for mood stabilization. Mother was also taking part in therapy. Both parents were participating in parenting education courses. Ms. Roberts ordered continued services and visitation, but ordered that visitation would be moved to Try-Again Homes should any further issues occur with the parents at N.P.'s home.

3

Ms. Roberts held a Permanency Review Hearing on February 15, 2013. All parties attended. The parties again stipulated to a finding of continued dependency. At that hearing, no issues were reported regarding visitation, and both parents had passed Agency drug tests. Ms. Roberts reported that both parents were compliant with treatment recommendations, were participating in services, and were completing their parenting education programs. Mother tested positive for methamphetamines, but Ms. Roberts, after hearing significant debate over whether this was a false positive or not, did not make a finding if this constituted drug use. Ms. Roberts increased the parents' visitation and permitted it to take place supervised by the parenting education provider, the Bair Foundation, in the parents' home. She ordered the parents to continue with parenting education through the Bair Foundation, and to continue with drug and mental health treatment.

Ms. Roberts held a further Permanency Review Hearing on March 15, 2013. All parties attended and again stipulated to continuing dependency. The Bair Foundation reported "bizarre behavior" from Mother during supervised visits on March 7 and 9 2013. The Bair Foundation report indicated a concern for her mental health. Ms. Roberts indicated that Father's medical providers reported he had a positive prognosis for recovery.

4

Both parents had completed a segment of their parenting education courses. Mother was drug tested by the Agency on February 15, 21, and 26, 2013. She tested positive for THC and methamphetamine use. Mother presented drug tests by a third party laboratory that indicated she underwent testing on December 10, 2012, January 10, February 4, February 18, March 4, and March 12, 2013 and tested positive only for her prescribed medication. Ms. Roberts did not decrease visitation but ordered both parents to submit to random drug testing at the discretion of the Agency.

Ms. Roberts held a further Permanency Review Hearing on May 10, 2013. Father did not waive his right to have the hearing heard before a Judge, and thus the hearing was continued to August 26, 2013.

At that time, the Honorable Katherine B. Emery conducted a Permanency Review Hearing. All parties attended. Judge Emery found that D.P. remained a dependent child under the care of the Agency, but ordered him to be returned to the home of his father. Judge Emery ordered supervised visitation for Mother for two times per week for a period of four hours each, to be supervised by the Bair Foundation. She further ordered both parties to continue with drug and alcohol services, and to submit to random drug testing, and for Mother to continue with her mental health treatment. Judge Emery also ordered that in addition to his ongoing services, Father was to have no contact with Mother while the child is in his

5

custody. Judge Emery scheduled a Permanency Review Hearing for November 12, 2013.

On November 12, all parties appeared. The parties stipulated to D.P.'s continued dependency. D.P. remained in the care of his father. Judge Emery increased Mother's visitation to three times per week. Judge Emery ordered Mother to continue with her drug, alcohol, and mental health services and drug testing. She did not order services for Father.

On January 29, 2014, the Court permitted the Agency to request termination of court supervision by motion prior to the next Permanency Review Hearing. The Agency presented such a motion on March 3, 2014. At that time, D.P. was in the care of his father and the Agency averred that the child was safe and doing well. The Court granted the motion and terminated supervision.

## II.    Second Placement

The Agency became involved with Mother and Father again on June 3, 2014, after receiving allegations that Father was abusing narcotics. On June 16, 2014, both parents were arrested at a gas station in West Virginia for being intoxicated in a moving vehicle. D.P. was present. Both were incarcerated and D.P. was placed in the case of his paternal grandmother, P. P. The Agency filed a Petition for Dependency on June 18, 2014.

The Court held a merit hearing on July 1, 2014. At that time, Father, P. P.

, the Agency Solicitor, two agency caseworkers, the Guardian ad Litem Frank C. Kocevar, Esq. and counsel for both parents, Tamora Reese, Esq. and Erick Rigby, Esq. attended. The parties stipulated to this finding of dependency due to the parents' ongoing incarceration in the State of West Virginia. The Court found D.P. to be a dependent child pursuant to 42 Pa.C.S. § 6302(1).

The Court ordered D.P. be placed in kinship foster care with P. P., D.P.'s paternal grandmother. The Court ordered both parents to take part in drug and alcohol evaluations, mental health evaluations, and parenting education programs upon release from incarceration. Both were afforded supervised visitation with D.P., upon release from incarceration, in the home of P. P. The Court assigned the case to Juvenile Hearing Officer Jessica Roberts.

## III. Compliance and Progress

Ms. Roberts heard the Initial Permanency Review on September 29, 2014. Counsel for all parties appeared and Father participated by phone. At that time, both parents remained incarcerated. Because the parents could not undergo services while incarcerated out of state, Ms. Roberts found no compliance with the permanency plan and no progress towards alleviating the circumstances which necessitated the original placement for either parent. Ms. Roberts ordered the primary placement goal to be a return of D.P. to his parents, with a concurrent goal

7

of adoption. Ms. Roberts continued the ordered services and visitation from the Order of Adjudication. She indicated that both parents were being held in West Virginia for their charges there, and that Mother was to be incarcerated at the Washington County Correctional Facility upon her release from incarceration in West Virginia due to a probation violation. Ms. Roberts indicated that D.P. was doing well in his grandmother's care.

Ms. Roberts held a Permanency Review Hearing on December 29, 2014. Counsel for all parties appeared and Mother participated by telephone. D.P. remained in the care of P. P. Both parents remained incarcerated. Because of their incarceration, Ms. Roberts found that the parents had not complied with the permanency plan and that they had made no progress in alleviating the circumstances which necessitated the original placement.

Ms. Roberts indicated that the parents were awaiting trial on charges of endangering the welfare of a minor child, and that they did call D.P. when they were able to. Ms. Roberts scheduled a further Permanency Review hearing for March 23, 2015.

Counsel for all parties appeared on March 23, 2015. Mother remained incarcerated in the Washington County Correctional Facility, but Father was released from incarceration in West Virginia on January 11, 2015.

8

Ms. Roberts found no compliance and no progress for Mother, due to her continued incarceration. She indicated that Mother had an impending hearing that could result in her imminent release. She found substantial compliance and progress for Father, indicating that he had taken part in his ordered drug and alcohol evaluation and was taking part in twice-weekly outpatient treatment. At that time, Father was no longer taking Suboxone, a treatment for opiate withdrawal, was attending Narcotics Anonymous meetings, and had tested negative on all Agency-ordered drug tests. She further found he was taking part in parenting education classes. The primary placement goal at this hearing remained return to parent.

Ms. Roberts modified the parties' visitation with D.P., permitting mother supervised visitation at the Washington County Correctional Facility and Father liberal supervised visitation in P. P.        's home. She retained all previously ordered services, and scheduled a hearing for June 15, 2015.

The Agency filed its Petition to Involuntarily Terminate the rights of both Mother and Father on February 11, 2015. The Court held a Hearing on the Agency's petition on May 27, 2015.

## Appellate Standard of Review

In an appeal from an order terminating parental rights, the appellate court is limited to determining whether the decision of the trial court is supported by

competent evidence. *In the Interest of S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005), appeal denied, 586 Pa. 751, 892 A.2d 824 (2005) (quoting *In re C.S.*, 761 A.2d 1197, 1199 (Pa. Super. 2000)). "[The appellate court is] bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence." *In re M.G.*, 855 A.2d 68, 73 (Pa. Super. 2004) (quoting *In re Diaz*, 447 Pa. Super. 327, 669 A.2d 372, 375 (1995)). The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony. *Id.* at 73–74; *In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa. Super. 2002). In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. *In re M.G.*, 855 A.2d at 73–74. When the trial court's findings are supported by competent evidence of record, [the appellate court] will affirm "even if the record could also support an opposite result." *In the Interest of S.H.*, 879 A.2d at 806. Absent an abuse of discretion, an error of law, or insufficient evidentiary support, the trial court's termination order must stand. *In re C.M.S.*, 884 A.2d 1284, 1286 (Pa. Super. 2005).

## Grounds for Termination

The party seeking termination of parental rights must prove by clear and convincing evidence that the parents' conduct satisfies the statutory grounds for termination. *In re Adoption of C.D.R.*, 111 A.3d 1212 (Pa. Super. 2015). The Court

10

must examine the individual circumstances of each and every case and consider all explanations offered by the parent(s) to determine if the evidence in light of the totality of the circumstances clearly warrants termination. *In re J.L.C.*, 837 A.2d 1247 (Pa. Super. 2003).

The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children. A parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be considered unfit and may properly have his or her rights terminated. *In re K.Z.S.*, 946 A.2d 753 (Pa. Super. 2003), citing *In re B.L.L*, 787 A.2d 1007 (Pa. Super. 2001).

The Agency requested the Court to terminate the parental rights of the parents pursuant to Subsections 1, 2, and 5 of chapter 2511 of the Adoption Act, enumerated below:

> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement

11

of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(1), (2), and (5).

Pennsylvania appellate courts have observed that there is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. A parental obligation is a positive duty which requires affirmative performance. This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child. *In re J.T.*, 983 A.2d 771 (Pa. Super. 2009), citing *In re Burns*, 474 Pa. 615, 379 A.2d 535, 540 (1977).

Pursuant to Subsection (a)(1), the Court must determine if the Agency established by clear and convincing evidence that for at least the six months prior to the filing of the termination petition, Mother and Father failed to perform their parental duties or evidenced settled purposes to relinquish their parental rights. § 2511(a)(1), see also *In re Adoption of R.J.S.*, 901 A.2d 502 (Pa. Super. 2006). Furthermore, in examining the parent's conduct, the court must look not only to the six (6) months before the petition but also examine the totality of the circumstances

12

of the case, including the parent's explanation and overall circumstances. *In re B.,* *N.M.,* 856 A.2d 847 (Pa. Super. 2004), citing *In re D.J.S.,* 737 A.2d 283, 286 (Pa. Super. 1999).

"[A] parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties." *In re Adoption of S.P.,* 616 Pa. 309, 47 A.3d 817 (Pa. 2012), citing *Adoption of J.J.,* 511 Pa. 590, 515 A.2d 883, 891 (Pa. 1986). While parental incarceration is not a litmus test for termination, it can be determinative of the question of whether a parent is incapable of providing essential parental care, control, or subsistence and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2). *In re Adoption of S.P.,* 616 Pa. 309, 332, 47 A.3d 817, 830 (2012).

A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. *In re B., N.M.,* 856 A.2d at 855, citing *In re C.M.S.,* 832 A.2d 457, 462 (Pa. Super. 2003).

Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the

13

child with his or her physical and emotional needs. *In re B., N.M.*, 856 A.2d 847, 855, citing *In re D.J.S.*, 737 A.2d 283, 286 (Pa. Super. 1999).

Agency Caseworker Tiffany Lindsay, Paternal Grandmother ℓ· ℓ· , Try-Again Homes Caseworker Bradley Poland, and Father testified at the termination hearing.

Ms. Lindsay credibly testified that after both parents were incarcerated in West Virginia, their contact with D.P. was limited. Credible testimony indicated that Mother sent no cards or letters to D.P. The parents "sporadically" called D.P. when they had "money on the books." According to Ms. Lindsay, D.P. would get upset when talking with his father. Furthermore, from the time of their incarceration to the date of the hearing, neither Mother nor Father provided financial support for D.P.

Bradley Poland, a Try Again Homes caseworker, testified regarding the interaction of each parent with D.P. Mr. Poland observed and supervised each parent with D.P. With regard to Mother, Mr. Poland testified that D.P. appeared to like the visits, though D.P. would not discuss the visits. In contrast, D.P. always mentioned his visits with his father and was excited to see his father. Father credibly testified that when he visits D.P. in the home of ℓ.ℓ. , he will wait until D.P. falls asleep to leave so as not to upset D.P. by his departure.

14

Ms. Lindsay stated that D.P. needs permanency and his interests are best served by termination and adoption by his paternal grandmother. Ms. Lindsay expressed sincere concern that if D.P. were returned to his parents he would encounter difficulties due to the unhealthy relationship Mother and Father have. Father corroborated this testimony and indicated "Me and [Mother] can't be together again."

In 2014, both Mother and Father pleaded guilty to charges relating to child endangerment in Marion County, West Virginia. At the time of the hearing, Father indicated he was participating in drug and alcohol counseling, a 12 step program, mental health treatment, and grief counseling concerning the loss of his daughter. He described long-term use of Oxycontin dating back to 1999. He admitted to abusing Xanax.

Mother remained incarcerated and had not begun services in compliance with the permanency plan. On March 25, 2015, the Honorable Valarie Costanzo sentenced Mother to a total of three (3) to twelve (12) months at the Washington County Correctional Facility at docket numbers CP-63-CR-2282-2013 and CP-63-CR-113-2013. This term was imposed consecutively to the balance of a prior sentence for driving on a suspended license that she was serving on probation when she was arrested in West Virginia. Mother testified that she could be released as early as July 2015 and as late as June 2016.

15

At the time of the termination hearing, D.P. had been in an out of home placement for twenty-two (22) of the last thirty-two (32) months. Mother and Father were both incarcerated for over six months preceding the filing of the petition for termination. Father had been released from incarceration at the time of the hearing, but was still taking part in services necessary to remedy the conditions that led to placement. Even where a parent makes earnest efforts, the court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. *In re Adoption of R.J.S.* 901 A.2d 502, 513 (Pa. Super. 2006).

Mother has made little progress since the placement of the child in 2012. She was ordered to undergo a drug and alcohol evaluation and to follow all recommended treatment as part of the disposition of the first merit hearing in 2012. When D.P. was returned to Father in 2014, the Court ordered Father to have no contact with Mother while D.P. was in his custody. At the time of termination of court supervision in June 2014, Mother was still undergoing treatment for drug use. She has made no progress at alleviating the same circumstances since the second placement.

Similar conditions were the cause of placement in 2012. D.P. was returned to Father in 2014 after being in placement for eleven months. However, he was to be placed again ten months after return and two months after the termination of

court supervision. The conditions that twice necessitated the placement of D.P. continue to exist, and no reliable or persuasive evidence was presented demonstrating that these conditions will be remedied by either parent within a reasonable period of time. The Agency proved by clear and convincing evidence that grounds for termination existed pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), and (5).

## Bond

Initially, the focus is on the conduct of the parent. Only when the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to 23 Pa.C.S.A. § 2511(b): Determination of the needs and welfare of the child under the standard of best interests of the child. *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007). In determining if termination best meets the needs of the child, the Court must examine the nature and strength of the parent-child bond and the effect of the severance of that bond. *In re C.M.S.*, 884 A.2d 1284 (Pa. Super. 2005).

Attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and the Court must weigh that injury against the damage that bond may cause if left intact. *In re T.S.M.*, 71 A.3d at 269.

17

The law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. *In re T.S.M.*, 620 Pa. 602, 71 A.3d 251 (Pa. 2013), citing *In re R.J.T.*, 608 Pa. 9, 9 A.3d 1179 (Pa. 2010).

The credible testimony provided by Mrs. Lindsay, P.P., and Father indicated that a bond exists between D.P. and his Father that can be beneficial. However, Father has not maintained a safe and stable home, as evidenced by D.P.'s necessary placement for twenty-two (22) of the last thirty-two (32) months, and his drug treatment is not complete. A child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting. *In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa. Super. 2003).

Ms. Lindsay testified that D.P. has a bond with both of his parents. Ms. Lindsay indicated that such bond will continue because P.P. is committed to permitting contact between D.P. and his birth parents.

Ms. Lindsay testified that D.P. is doing well in the home of P.P. She testified that P.P.'s home is now "home" for D.P. Furthermore, P.P. is a pre-adoptive placement resource who is also willing to serve as a permanent legal custodian. Mrs. Lindsay also indicated that P.P. is willing to enter into a voluntary agreement for continuing contact with both parents pursuant to 23 Pa.C.S.A. § 2731 et. seq.

18

P.P. credibly indicated to the court that she was willing to permit ongoing contact between D.P. and his parents, but would not permit Mother to be in her home because Mother is "violent." Specifically, Mother assaulted P.P. and Mother burned Father's vehicle. Mother herself admitted to burning Father's vehicle approximately "two years ago."

P.P.'s willingness to permit future contact was a factor the Court considered in determining if termination met the best interests of D.P. The effect of the severance of the parent-child bond will not be as severe because of Paternal Grandmother's credible assurance that she would permit contact between D.P. and his parents. The severance of the legal bond between parent and child does not inherently necessitate ending any relationship between parent and child. P.P. credibly testified that she would enter into a post-adoption agreement. For these reasons, the Court found that severing the bond between D.P. and Father would not cause irreparable harm to D.P. See *In re C.L.*, CP-63-OC-2010-802 (Pa.Com.Pl. 2010), aff'd at 32 A.2d 837.

At the hearing, Mother remained incapacitated, and the Court found that there is not a possibility she can remedy the circumstances that necessitated placement in the foreseeable future. D.P. was initially returned to his Father alone, and Mother was permitted only supervised visitation. She has displayed no compliance with court-ordered services and has made no progress to alleviate the

19

circumstances that necessitated placement. Testimony indicated that mother's contact with D.P. consisted of infrequent phone calls and mailed gifts of candy. On this basis, the Court found that a beneficial bond did not exist between Mother and D.P., and thus severing the bond would not cause harm to D.P.

For the above reasons, the Court found that termination was in the best interest of D.P.

## Conclusion

As both parents have not alleviated the circumstances that twice necessitated placement, requiring this case to continue with the goal of reunification gives rise to the real possibility that D.P. may end up placed in kinship or foster care three times in as many years. The Agency met its burden by clear and convincing evidence, and the credible evidence indicated that it was in the best interests of D.P. to have the parent-child bond terminated. To deny the Agency's meritorious petition would be to unnecessarily delay permanency for D.P. The Court appropriately terminated the rights of both parents. As such, this Court's order should be affirmed.

BY THE COURT

Michael J. Lucas, Judge

20

IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY,
PENNSYLVANIA
ORPHANS COURT DIVISION

IN THE INTEREST OF

D. P.

Case No. 63-15-0176

Minor Child

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND

## ORDER

1. On February 11, 2015 the Agency filed a petition to involuntarily terminate the parental rights of m. H. ("mother") and D. P. ("Father").

2. mother and Father are the biological parents of D. P. ("Child") a four (4) year old boy, born ( in :, 2010.

3. Service of the petition was effectuated by certified mail with a return receipt signed by Father on March 16, 2015 and by a restricted mail service upon mother while she was incarcerated at the Washington County Correctional Facility.

4. The procedural record of dependency proceedings at docket number DP 184-2012 indicates that child was first adjudicated a dependent child on September 14, 2012.

5. The Honorable John F. DiSalle found child to be dependent based upon testimony that mother left child, then less than 2 years old, unaccompanied in a vehicle while she went into a grocery store. Caseworker Henry went to the family home that day and observed mother to be erratic, agitated and unable to focus. mother could not change child''s diaper and requested father's assistance. A domestic argument then ensued. mother refused a drug test and father tested positive for benzodiazepines. Later that same day, father called the police and requested that mother be involuntarily committed. During this visit, Caseworker Henry observed child to be "dirty."

6. Judge DiSalle also credited testimony of Caseworker Reynolds who stated that mother previously had her parental rights for another child terminated on May 31, 2010. Caseworker Reynolds indicated mother had a "lengthy drug history including consumption of cocaine and opiates. At the time of the initial adjudication hearing, mother was prescribed Suboxone, Subutex and Lamictal. mother acknowledged she was under the care of a psychiatrist, Dr. Shahoud, and received treatment from

Western Behavioral Health. Judge DiSalle placed Child in a kinship placement. Judge DiSalle found aggravating circumstances regarding Mother but did not excuse the Agency from exercising reasonable efforts to reunify child with Mother.

7. On November 16, 2012, an initial permanency review hearing was held. The findings from the proceeding indicate that Father had completed mental health and a drug and alcohol evaluation. Dr. Rodney Williams determined that Father suffered from opiate dependence. Father began counseling and was prescribed both Subutex and Suboxone. Dr. Williams also evaluated Mother. Dr. Williams diagnosed Mother as suffering from Bipolar disorder and opiate dependence. N.P., a paternal aunt, and the placement provider, testified that both Mother and Father appeared "high" when visiting with Child.

8. On February 15, 2013 Master Roberts conducted another permanency review hearing. Master Roberts noted the progress both Mother and Father had made in treatment, but recommended continued placement and supervised visits. The Honorable Katherine B. Emery accepted the recommendation.

9. Further permanency review hearings were held on March 15, 2013, May 10, 2015 August 26, 2013 and November 12, 2013. On August 26, 2013 Judge

Emery returned Child to the home of Father. Judge Emery found on November 12, 2013 that Child was safe in his father's care and that Mother should have supervised visits.

10. On May 3, 2014 the Agency petitioned this court to terminate dependency and represented that Child was safe and doing well.

11. Within less than two (2) months, this court conducted another merit hearing as a result of a newly filed petition alleging Child's dependency. At the time of the hearing, both Mother and Father were incarcerated in West Virginia due to an incident on June 16, 2014. Specifically, this court found both were arrested due to their intoxication while in a moving vehicle with Child. As both were incarcerated, Child had no parental control, care or supervision. This court directed that Child be placed in the care of his paternal grandmother, P. P. . The Court directed that both Mother and Father have mental health and drug and alcohol evaluations. Further, both were directed to complete parenting education.

12. On September 29, 2014, December 29, 2014 and March 23, 2015 Master Roberts conducted permanency review hearings. With regard to Mother, Master Roberts consistently found no compliance with the permanency plan and no progress towards eliminating the circumstances that required placement. For Father, Master Roberts had similar findings in

the first two hearings. However, on March 23, 2014, after the Agency filed a petition to terminate parental rights, Master Roberts found that Father had substantially complied with the child permanency plan and had made substantial progress.

13 Mother has been convicted in Washington County, Pennsylvania of Hindering Apprehension; Criminal Mischief; Recklessly Endangering Another Person; Possession of a Controlled Substance; Driving Under the Influence and Driving under Suspension (DUI Related). Father served six months in jail in West Virginia on charges related to the June 16, 2014 incident. At the time of trial, Father remained subject to parole. According to the testimony of both Father and Mother, each was convicted in West Virginia of endangering the welfare of Child. Both admitted to entering guilty pleas on such charges.

14. Upon release from prison, Father did not return to his mother's home but resided with his brother in Washington, Pennsylvania. Father, however, was granted liberal supervised visitation in his mother's home with Child. Master Roberts specifically recommended and this court ordered that Mother could not be present for such visitation. Mother was granted supervised visitation at the Washington County Correctional Facility.

15. Testimony at the termination hearing from Caseworker Lindsay indicated that Child is doing well in the home of his paternal grandmother. Ms. Lindsay testified that P.P.'s home is "home" for Child. P.P. is a pre-adoptive resource who is also willing to serve as a permanent legal custodian for Child. Ms. Lindsay testified that P.P. is willing to enter into a voluntary agreement for continuing contact with both parents. See 23 Pa.C.S.A. § 2731, et. seq.

16. Ms. Lindsay credibly testified that after both Father and Mother were incarcerated in West Virginia, their contact with Child was limited. Mother sent no cards, letters or gifts to Child. Father "sporadically" called Child when Father had "money on his books." According to Ms. Lindsay, Child would get upset when talking with his father. From the time of their incarceration to the date of the hearing, Father and Mother provided no financial support for Child.

17. At the time of the hearing, Child had been in an out of home placement for 22 of the last 32 months.

18. Ms. Lindsay acknowledged that Child has a "bond" with both of his parents. Ms. Lindsay indicated that such bond will continue because P.P. is committed to permitting contact between Child and his birth parents.

19. P.P. credibly indicated to the court that she was willing to permit ongoing contact but would not permit Mother to be in her home because Mother is "violent." Specifically, Mother assaulted P.P. and Mother burned Father's vehicle. Mother, herself, admitted to burning Father's vehicle approximately "two years ago."

20. Bradley Poland, a Try Again Homes caseworker, testified regarding the interaction of each parent with Child. Mr. Poland has observed and supervised each parent with Child. With regard to Mother, Mr. Poland testified that Child appeared to like the visits, though Child would not discuss the visits. In contrast, Child always mentioned his visits with his father and was excited to see his father. Father credibly testified that when he visits Child in the home of P.P., he will wait until Child falls asleep to leave so as not to upset Child by his departure.

21. Ms. Lindsay stated that Child needs permanency and his interests are best served by termination and adoption by his paternal grandmother. Ms. Lindsay expressed sincere concern that if Child were returned to his parents he would encounter difficulties due to the unhealthy relationship Mother and Father have. Father corroborated this testimony and indicated "Me and Mother can't be together again."

22. At the time of trial, Father indicated he was participating in drug and alcohol counseling, a 12 step program, mental health treatment, and grief counseling concerning the loss of his daughter. Father described long-term use of Oxycontin dating back to 1999. He admitted to abusing Xanax. At the time of trial, Mother remained incarcerated and had not begun services in compliance with the permanency plan.

23. After weighing the testimony presented, the Court finds the agency has proven grounds for termination of parental rights by clear and convincing evidence.

24. Specifically, for a period of six (6) months immediately preceding the filing of the termination petition both parents failed to perform parental duties and Child had to be removed from their care by court order for a period in excess of six (6) months.

25. The conditions that led to Child 's removal continue to exist. No reliable and persuasive evidence was presented demonstrating that the conditions that led to Child's removal will be remedied by either parent, within a reasonable period of time. Specifically, Child has been out of his parent's care in 22 of the 32 months leading up to the termination proceeding.

26. Further, both parties' repeated and continued incapacity has caused Child to be without parental care, control or subsistence necessary for his physical

and mental well-being. The court finds that with regard to *Mother* there is no credible evidence that the causes of such parental incapacity will be remedied. With regard *Father*, the court finds credible evidence that his parental incapacity may be remedied. Specifically, at the March 23, 2015 permanency review hearing, Master Roberts found *Father* to be in substantial compliance with the child permanency plan and to have made substantial progress towards alleviating the circumstances that necessitated original placement.

27. After weighing the testimony presented, the Court finds that a bond does exist between *Child* and both parents.

28. After weighing the testimony presented, the Court finds that the bond between *Child* and *Father* can be a beneficial one to *Child*. However, despite the Agency's reasonable efforts *Father* has not maintained a safe and stable home for *Child*. Twenty two of the thirty two months prior to trial *Child* was in court ordered placement. Further, the credible evidence of record indicates that *P.P.* is willing to enter a voluntary agreement for continuing contact. The Court finds that severing the bond with *Father* will not cause irreparable harm to *Child* because *P.P.* will permit ongoing contact with *Father* to the extent such is safe and appropriate for *Child*.

29. After weighing the testimony presented, the Court finds that the bond between Child and Mother is not a beneficial to Child and should not be preserved. The court finds that such bond can be severed without irreparably harming Child.

**Conclusions of Law:**

1. Pursuant to 23 Pa.C.S.A. § 2511 (a)(1), (2) and (5) clear and convincing evidence was presented to terminate the parental rights of Mother.

2. Pursuant to 23 Pa.C.S.A. § 2511 (a)(1) clear and convincing evidence was presented to terminate the parental rights of Father.

3. The developmental, physical and emotional needs and welfare of Child require that his bond with Mother be severed. "...A child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re Adoption of M.E.P.,* 825 A.2d 1266, 1276 (Pa.Super.2003).

4. The developmental, physical and emotional needs and welfare of Child require that his bond with Father be severed. When a Child is placed in foster care, after reasonable efforts have been made to reestablish the

biological relationship, the needs and welfare of the child require CYS and foster care institutions to work toward termination of parental rights, placing the child with adoptive parents. **It is contemplated this process realistically should be completed within 18 months.** *In re G.P.–R.,* 851 A.2d 967, 975–76 (Pa.Super.2004) (quoting *In re B.L.L.,* 787 A.2d 1007, 1016 (Pa.Super.2001)) (emphasis added). Essentially, this legislation shifted away from an "inappropriate focus on protecting the rights of parents" to the priority of the "safety, permanency and well-being" of the child. *In re C.B.,* 861 A.2d 287, 295 (Pa.Super.2004), *appeal denied,* 582 Pa. 692, 871 A.2d 187 (2005). "While this 18–month time frame may in some circumstances seem short, it is based on the policy that a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re N.C.,* 909 A.2d 818 (Pa.Super.2006) *supra* at 824 (internal citations and quotation marks omitted). In re R.M.G., 2010 PA Super 103, ¶ 24, 997 A.2d 339, 349 (Pa. Super. Ct. 2010).

63-15-0176

2015 SEP 18 PM 2:36
REGISTER OF WILLS
WASHINGTON CO. PA
REGISTERED DATE

## ORDER

AND NOW, this 18TH day of September, 2015 following trial and review of written arguments submitted by the parties, the Court grants the petition of the Agency to terminate the parental rights of: Mother and Father to the minor child, D . P. The Agency proved by clear and convincing evidence statutory grounds for involuntary termination. Further, the evidence, taken as a whole demonstrated that termination of parental rights will best serve the developmental, physical, and emotional needs of the child.

BY THE COURT

_____ J.

MICHAEL J. LUCAS