J-A29030-14

2014 PA Super 284

IN RE: K.H.B., A/K/A BABY GIRL J., A/K/A K.J., A MINOR

IN THE SUPERIOR COURT OF PENNSYLVANIA

APPEAL OF: ALLEGHENY COUNTY OFFICE OF CHILDREN, YOUTH AND FAMILIES

No. 731 WDA 2014

Appeal from the Order entered April 7, 2014,
in the Court of Common Pleas of Allegheny County, Civil
Division, at No(s): TPR 172 of 2013

IN RE: K.H.B., A/K/A BABY GIRL J., A/K/A K.J., A MINOR

IN THE SUPERIOR COURT OF PENNSYLVANIA

APPEAL OF: ALLEGHENY COUNTY OFFICE OF CHILDREN, YOUTH AND FAMILIES

No. 732 WDA 2014

Appeal from the Orders entered April 7, 2014,
in the Court of Common Pleas of Allegheny County,
Orphans' Court, at No(s): TPR 172 of 2013

BEFORE:  FORD ELLIOTT, P.J.E., ALLEN, and STRASSBURGER*, JJ.

OPINION BY ALLEN, J.:                          **FILED DECEMBER 23, 2014**

Allegheny County Children, Youth and Families ("CYF") appeals from the orders entered on April 7, 2014, which denied CYF's petitions to involuntarily terminate the parental rights of K.B. ("Mother") and J.J. ("Father") to their minor daughter, K.H.B, ("Child"), born in March of 2012, pursuant to section 2511(a)(5), (8), and (b) of the Adoption Act, 23 Pa.C.S.A. § 2511(a)(5), (8), and (b).  We reverse and remand for further proceedings.

---

* Retired Senior Judge assigned to Superior Court.

This family has been known to CYF since 2007 due to Mother's and Father's drug, alcohol, mental health, and domestic violence issues. In 2008, four of Mother and Father's children were adjudicated dependent.[1] On March 29, 2012, CYF obtained an Emergency Custody Authorization ("ECA") for Child after Child was born. On March 30, 2012, Child was placed with Maternal Grandmother. On April 13, 2012, Child was adjudicated dependent due to the aggravated circumstances found against Mother and Father. Child remained with Maternal Grandmother until February 15, 2013. On February 15, 2013, Child was placed in Paternal Aunt's care.

Mother and Father's Family Service Plan Goals ("FSP") were: (1) to sign necessary releases of information; (2) to maintain relationship with Child through regular visits; (3) to contact and cooperate with CYF; (4) to participate in domestic abuse counseling; (5) to stabilize their mental health; and (6) to obtain appropriate housing. N.T., 2/10/13, at 8-9; 26-27. Father's additional FSP goals were: (1) to obtain drug and alcohol treatment; (2) to obtain drug screens; and (3) to obtain employment. *Id.* at 27.

On November 6, 2013, CYF petitioned for termination of Mother and Father's parental rights to Child. On February 10, 2014, March 26, 2014, and April 7, 2014, hearings were held on that petition. At the termination

---

[1] Mother and Father's parental rights to their other children were terminated. Paternal Aunt adopted four of Mother and Father's six children. Mother and Father's oldest two children were placed in Paternal Aunt's care, but aged out of the dependency system.

hearings, the following witnesses testified: Father; Paternal Aunt; Maryann Gordon, a clinical supervisor of Renewal Treatment, Inc.; Mother; Bonnie Antonucci, a CYF caseworker; and Dr. Neil Rosenblum, a licensed psychologist.

On April 7, 2014, the trial court determined that Mother and Father's parental rights to Child should not be terminated. The trial court found that CYF met its burden of proof by clear and convincing evidence that grounds for termination existed against Mother and Father under 23 Pa.C.S.A § 2511(a)(5). However, the trial court further found that CYF did not meet its burden of proof by clear and convincing evidence that termination met the needs and welfare of Child pursuant to Section 2511(b). On May 7, 2014 CYF timely filed notices of appeal from the decrees, along with concise statements of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). This Court consolidated the cases *sua sponte* on May 27, 2014.

On appeal, CYF raises the following issues:

1. Did the trial court err as a matter of law and/or abuse its discretion when it denied CYF's petition to involuntarily terminate the parental rights of Mother and Father pursuant to 23 Pa. C.S.A. § 2511(b) after CYF proved by clear and convincing evidence that termination of Mother's and Father's parental rights would best serve the developmental, physical, and emotional needs and welfare of [C]hild?

2. Did the trial court err as a matter of law and/or abuse its discretion when it denied CYF's petition to involuntarily terminate the parental rights of Mother and Father because

[Child]'s foster mother is not agreeable to entering into a voluntary Act 101, Post-Adoption Contact Agreement with Mother and Father?

CYF's Brief at 2.

In reviewing an appeal from the denial of a petition for the termination of parental rights, we are mindful that:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, [613 Pa. 371, 455,] 36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 613 Pa. 371[, 455], 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, [575 Pa. 647, 654-655], 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, [608 Pa. at 28-30], 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an

error of law or an abuse of discretion. ***In re Adoption of Atencio***, [539 Pa. 161, 165,] 650 A.2d 1064, 1066 (Pa. 1994).

***In re Adoption of S.P.***, 47 A.3d 817, 826-27 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained:

[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

***Id.*** (*quoting* ***In re J.L.C.***, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a), as well as section 2511(b). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we focus on section 2511(a)(5) and (b).

Sections 2511(a)(5) and (b) of the Adoption Act provide as follows:

**(a) General rule. --** The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the

conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

* * *

**(b) Other considerations. --** The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(5) and (b).

We review the evidence to support the involuntary termination of parent's rights pursuant to Section 2511(a)(5) as follows:

In order for termination pursuant to 23 Pa.C.S.A. § 2511(a)(5) to be proper, the following factors must be demonstrated: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to the child's removal or placement continue to exist; (3) the parents cannot or will not remedy the conditions which led to removal or placement within a reasonable period of time; (4) the services reasonably available to the parents are unlikely to remedy the conditions which led to removal or placement within a reasonable period of time; and (5) termination of parental rights would best serve the needs and welfare of the child.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1273-74 (Pa. Super. 2003).

CYF does not challenge the trial court's decision that CYF met its burden of proof by clear and convincing evidence that grounds for termination existed against Mother and Father under 23 Pa.C.S.A.

§ 2511(a)(5). We thus address CYF's argument that the trial court erred in determining that CYF did not meet its burden of proof by clear and convincing evidence that termination meets the needs and welfare of Child pursuant to section 2511(b).

In reviewing the evidence in support of termination under section 2511(b), our Supreme Court recently stated as follows.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." ***In re K.M.***, 53 A.3d 781, 791 (Pa. Super. 2012). In ***In re E.M.***, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. ***In re K.M.***, 53 A.3d at 791.

***In re: T.S.M.***, 71 A.3d 251, 267 (Pa. 2013).

As to the bond analysis, we have stated that, in conducting a bonding analysis, the court is not required to use expert testimony, but may rely on the testimony of social workers and caseworkers. ***In re Z.P.***, 994 A.2d 1108, 1121 (Pa. Super. 2010). This Court has observed that no bond worth preserving is formed between a child and a natural parent where the child has been in foster care for most of the child's life, and the resulting bond with the natural parent is attenuated. ***In re K.Z.S.***, 946 A.2d 753, 764 (Pa. Super. 2008).

*In re T.S.M.*, the Supreme Court observed:

Obviously, attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact. Similarly, while termination of parental rights generally should not be granted unless adoptive parents are waiting to take a child into a safe and loving home, termination may be necessary for the child's needs and welfare in cases where the child's parental bond is impeding the search and placement with a permanent adoptive home.

In weighing the difficult factors discussed above, courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail, as we have in this case, the result, all too often, is catastrophically maladjusted children. In recognition of this reality, over the past fifteen years, a substantial shift has occurred in our society's approach to dependent children, requiring vigilance to the need to expedite children's placement in permanent, safe, stable, and loving homes. ASFA was enacted to combat the problem of foster care drift, where children, like the children in this case, are shuttled from one foster home to another, waiting for their parents to demonstrate their ability to care for the children.

*In re T.S.M.*, 71 A.3d at 269.

Here, the trial court heavily relied on Dr. Rosenblum's testimony, concluding that termination was not appropriate because "the permanency which would be achieved by terminating Mother and Father's parental rights so that Child could be free for adoption by Paternal Aunt, does not outweigh the potential for developmental and emotional harm should '[Child] lose contact with her birth parents.'" Trial Court Opinion, 6/10/14, at 5. The trial court further stated, "a post adoption contact agreement must be a part of any potential adoption of [Child], and because Paternal Aunt would not

sign an agreement, termination does not meet the needs and welfare of Child." *Id.* Dr. Rosenblum testified regarding his recommendations for Child:

> Well, what I can conclude is that [Child] has been in foster care for her entire life, [twenty-two] months. I do believe she has a strong primary attachment to her [Paternal] Aunt. . . . She is in a stable secure environment with her aunt and six older siblings. She is doing well even though developmental [issues were] addressed. I do believe she has a stable relationship with [M]other and [F]ather. I do believe that [M]other and [F]ather are not able to provide her with a stable and secure home. I don't believe there is full confidence that [F]ather will remain drug-free if, indeed, he is today. I don't believe full confidence of anger management and conflict with Mother are fully resolved for [F]ather. Therefore, I don't believe the parents are in a position to provide [Child] with the type of home environment [she needs]. I believe there are risk factors because even if [F]ather were doing extremely well, I did question is [F]ather doing this because the [trial] court is observing his behavior and he knows that can lose custody of [Child] or is he doing it for reasons because he knows that he has to finally address these issues after so many years? I can't make that determination but I would still say there are these risk factors that move into the future and create concerns.
>
> So I believe that the most secure place for [Child] is with her [Paternal] Aunt and her siblings. I believe that typically with a case like this a goal change to adoption would be warranted but in this case because of the two factors—one, the positive relationship between [Child] and parents, and two, the history of [Paternal] Aunt not allowing any of the other children that she adopted contact with parents at all—I recommend the possibility of adoption mediation in this case.

N.T., 2/10/14, at 58-59.

In regard to Child's relationship with Mother and Father, Dr. Rosenblum testified that, if Mother and Father's rights to Child were

terminated, termination would not be damaging to Child "short-term." *Id*.

at 60. Dr. Rosenblum further testified:

> I mean, if the visits stop, I don't know that [Child] would be that distressed. I'm not sure there would be any behavioral changes in the way that she functions but I believe that the long-term, the option of long-term consequences, I do have some concern about this given this is a relative placement. I have concern that the other children don't have any contact with the parents. I have concern that for the next [sixteen] years that [Child] would not have contact and I do believe that represents a psychological loss for this child. She is not going to be adopted by someone. She knows from other children who her biological parents are. She would come to know that I have concerns about the level of estrangement that exists in the family at this time and long-term impact not only for [Child] but the other children as well.

*Id.* at 60.

Concerning Paternal Aunt and Child's bond, Dr. Rosenblum testified

that Paternal Aunt is a "very calm, very mature, and very nurturing parent."

*Id.* at 40. Dr. Rosenblum testified that Paternal Aunt does an "excellent job

of exposing [Child] to age appropriate developmental activities." *Id.* From

observing Child and Paternal Aunt's relationship, Dr. Rosenblum testified

that "[Child] uses [Paternal Aunt] as her anchor. [Child] would venture out

into the play area and play with different toys but invariably return to

[Paternal Aunt] and that was clearly her primary attachment figure." *Id.* at

41. Dr. Rosenblum testified that the most secure place for Child is with

Paternal Aunt and Child's six siblings. *Id.* at 59. Moreover, Dr. Rosenblum

opined that it would be detrimental to Child's psychological needs and

welfare if is she were removed from Paternal Aunt's care at this time. *Id.* at 84.

Paternal Aunt testified that she received threats from Father since Child was placed in her care. N.T., 3/26/14, at 16. Paternal Aunt obtained a Protection from Abuse Order against Father because of threats Father made against Paternal Aunt. *Id.* Paternal Aunt received a voicemail in April of 2013 from Father that stated "that he was coming to see [Paternal Aunt], bitch." *Id.* Paternal Aunt testified that she did not want physical contact with Father, but would allow him to send cards, gifts, and letters to Child. *Id.* at 24. Paternal Aunt further testified:

> We could talk about some things, but I want them – I don't want [Child] to be known with domestic violence or drugs or all bad stuff. I mean, I want the, [sic] to have a stable home or a stable telephone to be able to contact them, and I was even saying phone calls up to a point, you know. The visits as of right now, like they're not off the table but as of right now, I don't wish to do visits for the best interest of [Child].

*Id.* at 30. Furthermore, Paternal Aunt testified it was in Child's best interest to stay with Paternal Aunt. *Id.* at 36-37.

In *In re T.S.M.*, the Supreme Court commended the trial court's use of concurrent planning. *In re T.S.M.*, 71 A.3d at 269. The Supreme Court found that concurrent planning is a best practice, as it allows agencies to provide families with services in hope of reunification, while also preparing for the child's potential adoption, and is useful early in proceedings when it is unclear whether the parents will be able to parent their children. *Id.* at

269-70. However, the Supreme Court cautioned that "concurrent planning should not be used to prolong instability for children when it becomes clear that parents will be unable to provide their children's basic needs in the near future." *Id.* at 270. The Supreme Court recognized that a "[t]rial courts' use of concurrent planning beyond its useful life can create confusion for the children and potentially increase the difficulty for them to bond with pre-adoptive parents, thus perpetuating the problem of foster care drift." *Id.*

In this case, Dr. Rosenblum testified that terminating Mother and Father's parental rights would not be detrimental to Child "short-term." N.T., 2/10/14, at 59-60. However, Dr. Rosenblum based his recommendation against termination of Mother and Father's parental rights on his opinion that "long-term" termination may be detrimental to Child. *Id.* at 60. Dr. Rosenblum testified that Mother and Father do not have a healthy bond, and that it interferes with Mother and Father's ability to provide a stable home environment for Child. *Id.* at 46-47. With respect to Mother and Father's unhealthy relationship, Dr. Rosenblum testified that Mother is "not likely to take action to protect [Child] and to acknowledge and to be alert to these types of problems and the potential impact that it would have on [C]hild." *Id.* at 47. Dr. Rosenblum testified that "these problems have existed in the past which is why the parents lost their rights to several of their older children." *Id.* at 48. Furthermore, Dr. Rosenblum testified that

"this relationship hasn't changed therefore I don't think there is a high probability that it would change into the future." *Id.* at 49.

Although we defer to a trial court's determination regarding termination when it is supported by the record, we must reverse the trial court's determination in this case because we find the court's conclusion to be manifestly unreasonable, and thus an abuse of discretion. *In re Adoption of S.P.,* 47 A.3d at 826. In relying upon the mere existence of the bond between Mother and Father and Child, the trial court failed to recognize the substantial, possibly permanent, damage to Child by the prolonged, unhealthy, pathological bond with Mother and Father, especially as Child has formed a primary attachment to Paternal Aunt, who has provided the necessary love, care and stability to Child for most of Child's life. This Court will not prolong instability for Child when it is clear that Mother and Father will be unable to provide for Child's basic needs in the near future. *See In re T.S.M.*, 71 A.3d at 270. Additionally, there is no requirement that an adoptive parent be in place in order for parental rights to be terminated. *See In re Adoption of B.J.R.*, 579 A.2d 906, 915 (Pa. Super. 1990) (stating that the fact that the record offers no indication that CYS has found a prospective adoptive family for minor does not serve to bar the involuntary termination of parental rights where such termination is otherwise warranted); 23 Pa.C.S.A. § 2512(b). We conclude that termination of Mother and Father's parental rights best serves Child's needs

and welfare, so that Child may be placed promptly into a healthy, permanent home.

CYF also argues that the trial court erred as a matter of law and/or abused its discretion when it denied CYF's petition to involuntarily terminate the parental rights of Mother and Father because Paternal Aunt is not agreeable to entering into a Voluntary Act 101, Post-Adoption Contact Agreement with Mother and Father. CYF's Brief at 16-18. We agree.

"[T]he interpretation and application of a statute is a question of law that compels plenary review to determine whether the court committed an error of law. As with all questions of law, the appellate standard of review is *de novo* and the appellate scope of review is plenary." **C.B. v. J.B.**, 65 A.3d 946, 951 (Pa. Super. 2013), *appeal denied*, 70 A.3d 808 (Pa. 2013) (quoting **In re Adoption of J.A.S.***,* 939 A.2d 403, 405 (Pa. Super. 2007), *appeal denied*, 954 A.2d 577 (Pa. 2008)).

> [We] are constrained by the rules of statutory interpretation, particularly as found in the Statutory Construction Act. 1 Pa.C.S.A. §§ 1501–1991. The goal in interpreting any statute is to ascertain and effectuate the intention of the General Assembly. Our Supreme Court has stated that the plain language of a statute is in general the best indication of the legislative intent that gave rise to the statute. When the language is clear, explicit, and free from any ambiguity, we discern intent from the language alone, and not from the arguments based on legislative history or "spirit" of the statute. We must construe words and phrases in the statute according to their common and approved usage. We also must construe a statute in such a way as to give effect to all its provisions, if possible, thereby avoiding the need to label any provision as mere surplusage.

*In re Adoption of J.A.S*., 939 A.2d 403, 405-06 (Pa. Super. 2007).

Instantly, CYF's argument on appeal involves Act 101, which states, in relevant part:

**§ 2731. Purpose of subchapter.**

The purpose of this subchapter is to provide an option for adoptive parents and birth relatives to enter into a voluntary agreement for ongoing communication or contact that:

(1) is in the best interest of the child;

(2) recognizes the parties' interests and desires for ongoing communication or contact;

(3) is appropriate given the role of the parties in the child's life; and

(4) is subject to approval by the courts.

23 Pa.C.S.A. § 2731. An agreement under Act 101 "shall be filed with the court that finalizes the adoption of the child." 23 Pa.C.S.A. § 2735(a). The agreement shall not be legally enforceable unless approved by the court,[2] which the court shall approve when the statutory conditions are satisfied.[3]

Here, the trial court based its decision not to terminate Mother and Father's parental rights on Paternal Aunt not agreeing to a Voluntary Agreement for Continuing Contact with Mother and Father. Trial Court Opinion, 6/10/14, at 4-5. The statute by its plain language makes an agreement optional, and such agreement is plainly not required by Section 2511. When amendments were made to the Adoption Act in 2010, effective

---

[2] 23 Pa.C.S.A. § 2735(c).
[3] 23 Pa.C.S.A. § 2735(b).

in 2011, a voluntary agreement for continued contact was not added to Chapter 25.  Chapter 25 Proceedings Prior to Petition to Adopt remain separate from Chapter 27 Petition for Adoption.  *See* 23 Pa. C.S.A. §§ 2511-2558; 23 Pa. C.S.A. §§ 2701-2742.  We find that the trial court erred when it placed the burden of termination of Mother and Father's parental rights on Paternal Aunt's willingness to enter into a voluntary agreement for continuing contact following adoption, and when it conflated the analysis of termination of parental rights with adoption.

Accordingly, we reverse the trial court's denial of termination of Mother and Father's parental rights, and remand the matter to the trial court for further proceedings consistent with this Opinion.  Upon remand, the trial court shall promptly expedite resolution of CYF's termination petitions.  *See In re T.S.M.*, 71 A.3d at 269.

Orders reversed; case remanded to the trial court for further proceedings.  Jurisdiction relinquished.

President Judge Emeritus Ford Elliott joined the Opinion.

Judge Strassburger files a Concurring Opinion.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

- 16 -

Date: <u>12/23/2014</u>