J-S32003-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF N.U.J.-S., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.N.J., MOTHER | : : : : : : : | |
| | : | No. 613 EDA 2020 |

Appeal from the Order Entered January 23, 2020
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s): No. 2018-A0188

BEFORE: KUNSELMAN, J., KING, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.: **FILED AUGUST 17, 2020**

Appellant, A.N.J. ("Mother"), appeals from the decree entered January 23, 2020 that involuntarily terminated her parental rights to her daughter, N.U.J.-S., born 2012 ("Child,") pursuant to the Adoption Act.[1]

The factual and procedural history of this case are as follows. Mother suffers from mental health issues and has a significant history of suicide attempts and psychiatric hospitalizations.[2] N.T., 6/27/19, at 11. In February 2017, Mother attempted suicide while Child was present. *Id.* Following the attempt, the Montgomery County Office of Children and Youth ("OCY")

_____

[*] Retired Senior Judge assigned to the Superior Court.
[1] 23 Pa.C.S. §§ 2101-2938.

[2] H.A.S., Child's birth father, is named on Child's birth certificate. However, subsequent genetic testing confirmed that J.K., Child's putative father, was her biological father. N.T., 6/27/19, at 78-82. Neither H.A.S. nor J.K. is a party to the instant appeal, nor have they filed separate appeals.

implemented a safety plan requiring Child to stay with an aunt until Mother had recovered. *Id.* at 11-12. Mother was released from the inpatient psychiatric hospitalization on March 6, 2017, and Child was returned to her custody on March 21, 2017. *Id.* at 12-14. OCY provided Mother with various services to make sure that Child was safe and Mother was meeting her goals, including protective daycare, Justice Works, and High Fidelity. *Id.* at 12-14. Although Mother was cooperative with services, she required significant support from caseworkers to get Child to daycare, take Child to doctors' appointments, acquire a car seat, and have Child registered for school. *Id.* at 14-15.

Mother began outpatient mental health treatment at the Penn Foundation in June 2017, and was prescribed medication, including benzodiazepine. *Id.* at 16-18. Following drug tests, it became clear Mother was not taking her medication. *Id.* at 18. Additionally, Mother told her caseworker, Samantha Eldredge, that she could hear the neighbors "whispering racial things" about Mother and Child through the walls, and telling Child to act out and be disrespectful. *Id.* at 20. Mother presented with slurred words and slowed affect. *Id.* at 24-25. On June 12, 2017, following concerns that Child was not eating properly, could not identify letters and colors to complete a vision exam, and was not sleeping appropriately, OCY established a second safety plan resource with Child's aunt. *Id.* at 25-26.

On June 27, 2017, Mother again attempted suicide with Child in the home, and OCY took custody of Child. *Id.* at 26. OCY created a family service

plan for Mother, with Mother's main goal being to stabilize her mental health and keep her home stable, in addition to maintaining contact with Child through visitation. *Id.* at 31-32.

Mother was again hospitalized in November and December 2017. *Id.* at 38-40. Around that time, Child's placement was changed because Mother had called the police and made allegations that her kinship foster mother was holding Child hostage in the basement. *Id.* at 43. After a family engagement meeting, Child was moved to a non-kinship foster home. *Id.* at 44.

Mother was again hospitalized in November 2018, at which time she accused foster mother of sexually abusing Child. *Id.* at 64-65. This triggered a sexual abuse investigation and, after Mother was released from the hospital, she became upset because she did not understand that her own allegations had triggered the investigation. *Id.* at 64-69. Visitation could not be immediately resumed because Mother was not in a state to see Child, but began again in February 2019, first supervised by Ms. Eldredge and then in the community. *Id.* at 70.

OCY filed a petition to terminate Mother's parental rights on October 1, 2018. The court held hearings on the termination petition on May 15, 2019 and June 27, 2019. Additional evidence, in the form of a forensic evaluation by William Russell, Ph.D., and J.K.'s criminal record, was introduced on

September 25, 2019.[3] On October 11, 2019, a stipulation that Child was upset following a visit on October 9, 2019, was entered into evidence. Mother was represented by Karen Fairlie, Esquire, and was present at the hearing. J.K. was represented by John Armstrong, Esquire, but was not present, as he was incarcerated at SCI-Mahoney. N.T., 5/15/19, at 7. Lara Kash, Esquire, represented Child as her guardian *ad litem*.

Dr. Stephen Miksic testified that he performed forensic psychological, parenting, and bonding evaluations for Mother. N.T., 5/15/19, at 12-13. Dr. Miksic met with Mother on May 4, 2018, and May 11, 2018. *Id.* At that time, Mother had difficulty focusing, responding, and being redirected when she began speaking in a run-on fashion. *Id.* at 12-13, 18-19. Mother was very anxious, and her breathing was gasping and irregular. *Id.* at 19. Mother reported she had been in several treatment programs for intensive outpatient treatment, substance use, self-destructive behavior, and suicide attempts. *Id.* at 19. Mother had been prescribed multiple psychiatric medications, including Seroquel, Neurontin, Prozac, and Klonopin, but the medications were not controlling her symptoms consistently. *Id.* at 19, 21. Dr. Miksic diagnosed Mother with a bipolar mood disorder experiencing psychotic features. *Id.* at 27.

---

[3] Various exhibits were introduced into evidence and discussed during the termination hearings. However, none of the exhibits are contained within the certified electronic record.

Dr. Miksic described Mother's and Child's interaction as "very happy to see each other," and interacted positively at the beginning of the visit. *Id.* at 24. However, as the visit progressed, Mother became less engaged with Child. *Id.* Child attempted to get Mother's attention but Mother did not consistently respond. *Id.* Overall, Mother directly engaged with Child for about ten to fifteen minutes of the one-hour observation and was not able to meet Child's need for consistent attention. *Id.* Dr. Miksic described Mother and Child as having a strong, but unhealthy and insecure, attachment. *Id.* at 24-26, 60. Dr. Miksic's recommendations were for Mother to continue to be consistently engaged in psychiatric care and individual therapy, and find appropriate ways to engage with Child, but that it was most appropriate for Child to be adopted. *Id.* at 27-28. Dr. Miksic reached this conclusion because Mother had been receiving treatment for several years, but could not stabilize her symptoms or reach the functioning ability to allow her to gain more responsibilities for Child. *Id.* at 29. Further, Dr. Miksic opined that it was unhealthy for Child to have as strong and insecure an attachment as she did. *Id.* at 61. If Mother's parental rights were terminated, Dr. Miksic recommended therapy for Child and continued contact with Mother in a therapeutic setting. *Id.* at 61-63.

Lauren Greisser testified that she is Child's trauma-focused therapist and has worked with Child since November 2018. *Id.* at 80-81. Ms. Greisser meets with Child once a week for forty-five to fifty minutes. *Id.* at 82-83. Child presented with worries and fears related to Mother's and foster mother's well-being, issues sleeping, and significant attachment difficulties. *Id.* at 84.

Child related to Ms. Greisser instances of stress and fear, including riding in a police car alone while her mother was being taken to the hospital, and being fearful about where she was going. *Id.* at 94. Child calls her foster mother "Mom" unless they are visiting with Mother, when she calls foster mother "Ms. [R.]." *Id.* at 84. Ms. Greisser testified that, although Child had shown some improvement, she was still very clingy with her foster mother and foster sister. *Id.* at 89-91. Child has expressed a wish to be adopted. *Id.* at 99.

Child's foster mother, R.K., testified that Child was placed in her home in December 2017. *Id.* at 120. Also living in the home is R.K.'s teenaged biological daughter, A.K., who serves as a big sister role model for Child. *Id.* at 120-21. The two girls do homework and play games together. *Id.* at 121. At school, Child has an individualized education plan ("IEP"), a reading specialist, and a small group to assist in math. *Id.* at 122. She is involved in gymnastics, swimming lessons, and is interested in cheerleading. *Id.* at 123. Child attends trauma therapy every week and enjoys working on coping mechanisms with her foster mother and sister. *Id.* Child suffered from intense nightmares and tantrums when she first arrived in the home, but is working on sleeping in her own bed and recognizing when she is having "big feelings." *Id.* at 125-26. Child has not had a tantrum in months, and is doing well at staying in her own bed and talking about her nightmares. *Id.* at 128.

R.K. supervised visits between Child and Mother, and noted that Mother would often say inappropriate things to Child, such as "if anyone ever tried to hurt [Child,] [Mother] will kill them," and telling Child Mother had to carry a

knife because ghosts were stealing things from her home. *Id.* at 131. Sometimes the interactions would be normal, but the visits were unpredictable. *Id.* at 134-35. At a recent visit, Mother told Child that her "baby daddy" would be at the court hearing. *Id.* at 137. At another visit, Mother appeared to have a seizure episode. *Id.* at 142-44.

Child regresses after every visit, and will use baby talk, one-word answers, incomplete sentences, or pretend she doesn't hear or understand what is being said. *Id.* at 138. The regression continues for a short time at home, although previously, Child would lay awake until 10:00 p.m. or 11:00 p.m. and be late for school in the morning. *Id.* at 138-39. Since becoming more comfortable talking about her feelings, Child's transition to her "normal self" after visits with Mother has been easier. *Id.* at 139-40.

Child is very worried about her mother and whether Mother is taking her medications. *Id.* at 145. However, R.K. has reassured Child that that is an adult's responsibility. *Id.* Child seemed less worried after R.K. hung pictures of Mother in Child's room next to her bed, and was able to focus Child on a routine and structure. *Id.* Recently, Child has begun expressing a desire to be adopted. *Id.* Child stated to her foster sister and in front of R.K., "Do you know why I want to be adopted? . . . because my mom tries to hurt herself." *Id.* at 148. Child then described how Mother had hurt herself and that Child was there when the incident occurred. *Id.*

R.K. described the strong relationship she has with Child's biological aunt and cousins, and that she schedules FaceTime calls for Child every week.

*Id.* at 149-50. She would continue this contact after adoption. *Id.* Child loves her mother very much, and R.K. would allow contact with Mother so long as Child's therapist could remain in contact with Mother's treatment team to discuss whether Mother was in a good mental health state before visits. *Id.* at 160, 189-90.

Ms. Eldredge testified at length regarding the history of the case. *Id.* at 1-101. Further, she testified that, as of the date of the hearing, Mother was substantially compliant with her goals, visited with Child regularly, and maintained a relationship with her daughter. N.T., 6/27/19, at 32. She was compliant with mental health services. *Id.* at 32, 46-47. However, she had made only minimal progress towards reunification because her mental health has not been stable to the point that Child could be returned to her custody. *Id.* at 32, 46-47. While Mother had housing, she had not successfully applied for disability. *Id.* at 33. Mother did not successfully complete Time Limited Family Reunification or the Justice Works STOP program. *Id.* at 34-35. Mother's mental health never stabilized enough that she could take parenting classes. *Id.* at 111.

Ms. Eldredge testified that Child is happy to see Mother and loves her. *Id.* at 111. However, during visitation, Mother did not interact appropriately with Child, had difficulty engaging Child in activities, and needed to be redirected. *Id.* at 48, 50-51. Mother would often confirm a visit, and then fail to show up, causing Child significant distress. *Id.* at 52-53.

Dr. Alan Sofranko testified that he is Mother's attending psychiatrist as of March 2019. *Id.* at 167. Mother is part of the Assertive Community Treatment (ACT) program, which assists patients struggling with severe, persistent mental illness. *Id.* at 168. The program brings treatment to clients in the community, acting as a "hospital without walls." *Id.* Dr. Sofranko, specifically, directs medication management. *Id.* at 169. He performed an initial evaluation of Mother in March 2019, and diagnosed her with a history of bipolar disorder with psychotic features, and, as a result of her history of trauma, with post-traumatic stress disorder (PTSD). *Id.* at 171-72. Dr. Sofranko never observed Mother interacting with Child. *Id.* at 199.

The ACT program began offering Mother in-home services of mental health assessments and medication services under observation. *Id.* at 173. Mother is prescribed Seroquel, Nuerontin, Gabapentin, and, at times, Trilafon and clonazepam. *Id.* at 175-76. Mother was also referred to addiction counseling and a weekly dual diagnosis group. *Id.* at 173. As of the date of the hearing, Mother was "100 percent" compliant with all recommendations and requests. *Id.* Mother's apartment was clean and organized. *Id.* at 174-75. Mother has had some medication adjustments, but no major medication adjustments, and, overall, has been stable. *Id.* at 177-79. Overall, Mother's mental health has improved since beginning the ACT program; she has experienced longer periods of stability without evidence of manic behavior or major depression. *Id.* at 184. Mother's mental health was stable and there was no evidence of a relapse. *Id.* at 185. ACT is an "open-ended" program

and Mother can remain in it for as long as she wishes, although Mother can also stop treatment whenever she wishes, as treatment is not court-ordered. *Id.* at 192-93, 206-07.

Lina Miley is a co-occurring specialist on the ACT team. *Id.* at 213. Mother is her client. *Id.* at 214-15. As of March 2019, Ms. Miley meets with Mother biweekly for an hour of individual therapy at Mother's home, as well as weekly at group therapy. *Id.* at 215-16. Ms. Miley described Mother's home as extremely clean, with pictures of Child everywhere. *Id.* The ACT team sees Mother three times a week to deliver medication. *Id.* at 217. Mother's interactions with her peers are social, easygoing, and she listens well and offers feedback and support to others. *Id.* at 217. Mother has been consistent about attending therapy and has not missed an appointment. *Id.* at 220-21. Mother talks about Child "all the time," specifically about visits with Child. *Id.* at 218-19.

J.B., Child's maternal grandmother, testified that Mother is a very loving and attentive Mother. *Id.* at 227. J.B. testified that Child and Mother are "more like sisters, big sister/little sister. Their bond is unreal." *Id.* at 228. J.B. believes that Child loves Mother. *Id.* at 229. With regard to Mother's mental health, J.B. believes that Mother is doing "a lot better." *Id.* at 231. J.B. testified that Mother has been struggling with mental illness since her early twenties, and that the family has had to take care of Child at various times when Mother was hospitalized. *Id.* at 235.

Mother testified that she is currently leasing an apartment in Telford, Pennsylvania, and has lived at that address for the last four years. *Id.* at 240-41. Mother's housing is partially funded through the office of Housing and Urban Development ("HUD"), and her income is from disability. *Id.* at 243-44. She testified that she cleans her own apartment and buys her own groceries. *Id.* at 245. Mother testified that during visitation, she takes Child to the library and they read together; Mother does Child's hair; she brings Child snacks; Mother attempts to engage with Child in "certain activities." *Id.* at 245-46.

Mother testified that, since beginning with the ACT program, she has been responsible for transportation to and from visitation and has been granted increased visitation length. *Id.* at 248-49. Mother testified that she is aware of how her mental health affects her daughter and how important it is to maintain her mental health. *Id.* at 249-50.

At the close of the hearing, Attorney Kash relayed to the court that she spoke privately with Child in March 2019. *Id.* at 288. Child stated that she wished to be adopted and wanted to stay in her current living situation with R.K. *Id.* Attorney Kash argued that reunification was not a feasible and appropriate goal at this point in the case. *Id.* at 289. Specifically, Attorney Kash noted that, after two years, Mother could not demonstrate she had the ability to meet Child's basic needs, and that Mother still had not moved beyond supervised visits. *Id.* at 290. Child's best interests would be met by

termination, as she is thriving in her placement and needs permanency and stability moving forward. *Id.* at 290-91.

Following the hearings, the orphans' court entered a decree terminating Mother's parental rights pursuant to Section 2511(a)(2), (8), and (b) of the Adoption Act. Mother filed a timely appeal of the decree.

On appeal, Mother raises the following issue for our review:

> 1. Did the trial court err in terminating [Mother's] parental rights pursuant to 23 Pa.C.S. § 2511(a)(2) where evidence at trial failed to establish by clear and convincing that any incapacity, abuse, neglect or refusal to parent by [Mother] caused the child to be without essential parental care, control or sustenance necessary for her physical or mental well-being?

Mother's Brief at 6.

Our standard of review of a decree terminating parental rights is limited to determining whether the orphans' court abused its discretion, committed an error of law, and whether its decision is supported by competent evidence. *In re B.J.Z.*, 207 A.3d 914, 921 (Pa. Super. 2019). The petitioner bears the burden of demonstrating grounds for termination by clear and convincing evidence, which "is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation and quotation marks omitted).

Under Section 2511 of the Adoption Act, a court must engage in a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*Id.* (citation omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (en banc) (citation omitted).

In the present case, the orphans' court terminated Mother's parental rights pursuant to Section 2511(a)(2), (8), and (b). In order to affirm a termination of parental rights, we need only agree with the trial court as to any one of the grounds for termination identified in Section 2511(a), as well as Section 2511(b). *B.J.Z.*, 207 A.3d at 922. Here, we analyze the court's termination decree pursuant to subsections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and

> causes of the incapacity, abuse, neglect or refusal cannot or
> will not be remedied by the parent.
>
> * * *
>
> **(b) Other considerations.--**The court in terminating the rights
> of a parent shall give primary consideration to the developmental,
> physical and emotional needs and welfare of the child. The rights
> of a parent shall not be terminated solely on the basis of
> environmental factors such as inadequate housing, furnishings,
> income, clothing and medical care if found to be beyond the
> control of the parent. ...

23 Pa.C.S. § 2511(a)(2), (b).

To terminate parental rights under Section 2511(a)(2), the following

three elements must be met:

> (1) repeated and continued incapacity, abuse, neglect or refusal;
> (2) such incapacity, abuse, neglect or refusal has caused the child
> to be without essential parental care, control or subsistence
> necessary for his physical or mental well-being; and (3) the
> causes of the incapacity, abuse, neglect or refusal cannot or will
> not be remedied.

**B.J.Z.**, 207 A.3d at 922 (citation omitted).  "The grounds for termination due

to parental incapacity that cannot be remedied are not limited to affirmative

misconduct. To the contrary, those grounds may include acts of refusal as well

as incapacity to perform parental duties." **Id.** (citation omitted).

Mother argues that the court erred in terminating her parental rights

pursuant to Section 2511(a)(2) because the incapacity had been remedied or

was well on its way to being remedied. **See** Mother's Brief at 13-14.  Mother

contends that the court erred in relying on the testimony and report of Dr.

Russell, who only interviewed Mother briefly and did not have an ongoing

relationship with her. **Id.** at 14.  Mother contends that the court should have

considered only her current state and whether the conditions leading to Child's placement could be remedied. *Id.* at 14-15. Thus, she contends, the record showed that her mental health had stabilized and she was ready to care for her daughter. *Id.*

In finding grounds for termination of Mother's parental rights under Section 2511(a)(2), the orphans' court stated

> Birth mother presented her own testimony and the testimony of her mental health care providers, which demonstrates that[,] since February 2019, she has been actively participating with considerable success in the "ACT" program, which is offered by the Penn Foundation. This is a comprehensive mental health care program that provides her not only with therapy and medication management, but considerable life supports that are available to assist her five days per week. These intensive mental health supports include in-home services, mental health assessments, safety assessments, medication services, and weekly dual diagnosis group therapy. Given her success with this program in the months preceding the court hearings, which was not considered when Dr. Miksic performed his 2018 evaluation of birth mother's parental capacity, this [c]ourt appointed Dr. William Russell[, Ph.D.,] to perform a more up to date parenting capacity evaluation that was completed in September 2019. [Dr. Russell,] in his parenting capacity evaluation, reporting on observations and evaluations conducted on July 29, 2019 and August 2, 2019, reached the following conclusions:
>
> > The most salient issue in this case revolves around [Mother's] ongoing need for extensive and intensive treatment and the length of time that has gone on where she has demonstrated a pattern of not being able to consistently follow recommended treatment protocols and function independently. That is, her history reflects continual problems functioning despite significant assistance. Her mental health symptoms remain florid [*sic*] due to problems with medication management and inconsistent treatment. The breadth and depth of the impact of her mental health

issues is clearly reflected in the intensive level of services currently needed to allow her to function adequately on a daily basis. The ongoing issue is the inability of [Mother] to sustain appropriate care for herself without significant assistance. At this point, the intensity of the ACT program and the other programs in place provide for the functioning level that allows for appropriate daily living skills and emotional stability for [Mother] herself. Despite the intensive services[, Mother] still experienced issues of paranoia as recently as this summer. Her psychological testing is consistent with an individual with a mood disorder with psychotic symptoms who is medicated. That is, the medication issues with thinking and mood problems are present.

. . .

More importantly, the concern extends to [Mother's] ability to concomitantly provide safety and care to a young child with a history of emotional disturbance who needs consistent and structured assistance with normal developmental processes, help with her own mental health needs, assistance with her education needs, assistance getting to several extracurricular activities on a regular basis and more.

At this point, [Child] appears to be responding positively to the structure and consistency of the foster home. She is participating in social activities, has appropriate education services (IEP), is engaged in individual therapy and is able to articulate the current family situation and express her need for continuation of the current family environment. [Child] has indicated to her therapist and agency workers that she wants to remain with her current caretaker . . . and that she wants to be adopted by [her] but she also wants contact with her birth mother . . . [Child] was asked if she could choose where would she reside. She replied, "I want to live with [foster mother], but I miss my mom."

>Based on the data reviewed and these evaluations, it is the clinician's opinion that [Mother] cannot provide safety and permanency to her child [].

Notably, Dr. Russell added: "If possible, some sort of contact with birth mother should be maintained.["] Report of Dr. William Russell, based upon evaluations on July 29, 2019 and August 8, 2019, Court's Exhibit 1.

Birth mother argues that the testimony of her psychiatrist, Dr. Sofranko, demonstrates that her mental health has improved and stabilized. To be sure, Dr. Sofranko testified that during the period of approximately four months that she had been in treatment with him with the intensive support of the ACT program under his supervision, from March 2019 until his testimony on June 27, 2019, he observed "no evidence of manic behavior" and "no periods of major depression." He also noted that this "would be defined as someone in our program that is successful, maintaining success." Notably, he did not express an opinion that she would be able to maintain this functioning without the intensive supports that she receives through the program, nor did he express an opinion on her ability to care for a child on a 24/7 basis. Moreover, the period of [Mother's] experience in the program was relatively brief, as compared to the more than two years that [Child] had by that time been removed from the home.

[Mother] argues that the agency has not established that the causes of her incapacity [cannot] or will not be remedied. This [c]ourt is aware that [Mother] is determined to address her mental health issues and that the issue here is not a question of whether she is willing to remedy the condition that causes her incapacity to parent. However, Dr. Russell's evaluation concluded that there remain significant concerns as to whether she can continue to care for herself and maintain her stability, even with the present intensive interventions, and even greater concerns regarding whether she can -- while maintaining her own stability -- provide adequate care to meet the needs of a young child on a 24[-]hour[-]a[-]day basis. Dr. Russell noted that in the summer of 2019 -- the same period about which Dr. Sofranko testified to her relative success in the program -- [Mother] continued to have paranoid ideations that required an adjustment to her medication.

Although [Mother,] with the daily support of the clinical ACT team, has made and appears to continue to make great strides in

achieving her own mental health stability, this [c]ourt concludes that, based upon her entire mental health history, and the significant needs of her daughter for security and stability, and the conclusions of Dr. Russell, that she does not have the capacity to meet [Child's] needs on a daily basis and that this incapacity cannot or will not be remedied. [Child] has been removed from [Mother's] care for a period of two and a half years. Although [Mother] has made great strides in addressing her mental health issues, and loves her daughter, her incapacity to parent her child on a 24/7 basis, sadly, has not been remedied and cannot be remedied.

**See** Orphans' Court Opinion, 1/22/20, at 7-8.

Upon a careful review of the record, we conclude the orphans' court's termination of Mother's parental rights under Section 2511(a)(2) was warranted. Child has been removed from Mother's care for a period of two and one-half years, and, although Mother has achieved a degree of personal stability with regard to her mental health, that stability has not been possible without near-daily intervention from an entire team of caregivers. There is no indication that Mother could maintain this stability with the additional stresses of round-the-clock childcare. Further, this stability is relatively new -- approximately four months, as opposed to two years of prior instability. The orphans' court did not err in considering the context of Mother's stability, as well as the persistency and severity of her symptoms.

Accordingly, we discern no error of law or abuse of discretion in the orphans' court's finding that clear and convincing evidence supported the termination of Mother's parental rights pursuant to Section 2511(a)(2). Mother's "repeated and continued incapacity" to achieve stability without heavy intervention left Child without essential care from Mother necessary for

Child's well-being, and the cause of Mother's incapacity -- her severe mental illness – "cannot or will not be remedied" by Mother.  23 Pa.C.S. 2511(a)(2); *see also B.J.Z.*, 207 A.3d at 922.

Having resolved that grounds for termination existed under Section 2511(a)(2), we now proceed to the second part of the analysis under subsection (b).  Mother did not raise a challenge to the court's findings under Section 2511(b) in her Pa.R.A.P. 1925(b) statement of errors complained of on appeal, nor does she address Section 2511(b) in her brief.  Accordingly, we find that she has waived her challenge to the court's Section 2511(b) finding that it was in Child's best interests for Mother's parental rights to be terminated.  *See* Pa.R.A.P. 2116(a) ("No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby."); *Commonwealth v. Spotz*, 18 A.3d 244, 281 n.21 (Pa. 2011) (without a "developed, reasoned, supported, or even intelligible argument[, t]he matter is waived for lack of development"); *In re M.Z.T.M.W.*, 163 A.3d 462, 465–66 (Pa. Super. 2017) ("this Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority" (*citing In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011)).  Even if not waived, however, we would find any challenge to the Section 2511(b) holding meritless.

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. ... Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act.  Case law, however, provides that

analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re G.M.S.*, 193 A.3d 395, 401 (Pa. Super. 2018) (citation and brackets omitted). "The mere existence of an emotional bond does not preclude the termination of parental rights. Rather, the orphans' court must examine the status of the bond to determine whether its termination would destroy an existing, necessary and beneficial relationship." *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (citations and quotation marks omitted). "Ultimately, the concern is the needs and welfare of a child." *In re M.P.*, 204 A.3d 976, 983 (Pa. Super. 2019).

In making its determination that termination of parental rights was appropriate under Section 2511(b), the orphans' court engaged in the following discussion:

[Mother] and [Child] clearly love each other. However, although there is a bond between [Mother] and [Child], this bond between them has been described as strong [but] insecure. [Child] is unable consistently to find in her relationship with her mother the safety and security that a child needs from a parent. This [c]ourt is sensitive to and impressed by the efforts that [Mother] has been making to care for herself and attend to her own mental health needs. Nevertheless, the court is persuaded, through the clear

and convincing testimony of the caseworkers, Dr. Miksic and Dr. Russell, that [Mother] continues to suffer from a serious incapacity to parent that cannot be remedied adequately to meet the needs of this child for a stable and loving home. This [c]ourt therefore concludes that while there is a bond between [Mother] and [Child,] this bond is not a secure and healthy parental bond.

Both of the experts who evaluated the attachment between [Mother] and [Child,] Dr. Miksic and Dr. Russell, also concluded that, given the strong relationship between [Mother and Child,] continued contact between [them] would be in the best interests of [Child.]

Given the strong, loving attachment between [Mother and Child,] this court has difficulty concluding that there will be no detriment to [Child] in terminating [Mother's] parental rights . . . in this case, the evidence demonstrates that the bond between [Mother and Child,] while strong, is insecure, and that an insecure parental bond is not healthy for the child. The evidence also demonstrates that [Child] is in a safe, stable and nurturing home, with a foster mother who is meeting her needs for stability and security, as well as providing for her physical and emotional health and welfare, and supporting her in therapy. [Child's] counsel represented to the court that [Child] wishes to be adopted by her foster mother and remain in that home, while at the same time [Child] expressed that she loves [Mother] and wishes to continue a relationship with her.

The [c]ourt considers with seriousness the recommendations of the experts in this case that continued contact between this mother and this child is to be strongly encouraged. The [c]ourt has been advised that the child herself desires this continued contact with [Mother]. In this case[,] the child lived with her mother for the most part for the first five years of her life and, when her mother has been healthy, has had numerous visits with [Mother]. Moreover, [Mother] has demonstrated that she is committed to maintaining a relationship with her daughter and that she is making progress in addressing her mental health issues.

The failure of the parties to reach agreement on a voluntary post-adoption contact agreement at this stage does not overcome the court's conclusion that OCY has established, by clear and convincing evidence, a basis for termination of [Mother's] parental

rights. Further, the failure of the parties to enter into a post-adoption contact agreement does not impact this court's analysis of the developmental, emotional and physical needs and welfare of the child pursuant to section 2511(b). *In re K.H.L.R.*, 107 A.3d 175 (Pa. Super. 2014). The Superior Court has observed that "the uncertainty of an open adoption" is not a consideration that is either "appropriate or relevant in a termination analysis under section 2511(b)." [*In re G.L.L.*], 124 A.3d 344, 348 (Pa. Super. 2015).

However, it is most certainly the purview of this court to weigh seriously the status of the bond between the child and the natural parent, and to consider whether terminating the natural parent's rights would destroy something in existence that is necessary and beneficial to the child. What makes this case particularly difficult is that there is a strong and loving bond between [Mother and Child]. The bond is insecure, due to the history of [Mother's] severe mental illness, with the result that there are aspects of it that are detrimental to [Child's] well-being, especially when the mother is not able to be present as scheduled and expected. Nevertheless, it appears to this [c]ourt, based upon the recommendations of the experts, and the testimony of [Mother] herself, that continued contact with [Mother], without parental responsibility on the part of [Mother], is in [Child's] best interest.

Despite this conclusion, considering all of the evidence regarding the grounds for termination of parental rights and the developmental, emotional and physical needs and welfare of the child, this court concludes that termination of the parental rights of the birth mother, so that the child may be adopted, will best serve the needs and welfare of the child and, on balance, will not be detrimental to the child.

*See* Orphans' Court Opinion, 1/22/20, at 16-19.

Having comprehensively reviewed the record, we conclude that the orphans' court did not err or abuse its discretion in finding that the termination of Mother's parental rights best served the needs and welfare of Child. While Mother has a strong bond with Child, this fact alone does not preclude the termination of Mother's parental rights. *N.A.M.*, 33 A.3d at 103. Testimony

introduced at the hearing showed that the bond between Mother and Child is strong, but unhealthy, and that Child requires more stability and permanency than Mother could provide, even with intensive intervention and daily medical care. As our Supreme Court has observed, when conducting a needs and welfare analysis under Section 2511(b), "courts must keep the ticking clock of childhood ever in mind" and remain cognizant of the fact that "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly." *See In re T.S.M.*, 71 A.3d 251, 269 (Pa. 2019). Thus, we adopt the court's findings and analysis as reproduced above.

In sum, the court did not err in finding, by clear and convincing evidence, that termination of Mother's parental rights would best serve the needs and welfare of Child. *M.P.*, 204 A.3d at 983. Accordingly, we affirm the orphans' court decree.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/17/20